# COLORADO COAL AND IRON COMPANY *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

Argued November 2, 1887. — Decided November 21, 1887.

To a bill in equity to cancel a patent of land from the United States to a preëmptor, solely on the ground that there was no actual settlement and improvement on the land, as falsely set out in affidavits in support of the preëmption claim, the defence of a *bona fide* purchaser without notice is perfect.

In a suit by the United States to cancel a patent of public land the burden of producing the proof and establishing the fraud is on the Government, from which it is not relieved although the proposition which it is bound to establish may be of a negative nature.

When a plaintiff's right of action is grounded on a negative allegation, which is an essential element in his case, or which involves a charge of criminal neglect of duty or fraud by an official, the burden is on him to prove that allegation, the legal presumption being in favor of the party charged.

In a proceeding in equity against an innocent purchaser to set aside a patent of public land for fraud in which it is charged that an officer of the United States, who was concerned in its issue, participated, the burden of establishing his title is not cast upon the defendant by raising a suspicion, however strong, of the alleged fraud and wrongdoing of the officer, if the officer could have been examined and was not.

In this case the United States sought to cancel a number of patents to preëmptors, the lands having passed into the hands of an innocent purchaser, on the ground that there were no actual settlements and improvements,

but that the alleged preëmptors were fictitious persons, who did not exist, and that these facts were known to the register and receiver, through whose fraudulent act in this respect the patents were obtained. Having established that there were no such settlements and improvements, the plaintiffs introduced the evidence of many witnesses residing in the vicinity that the persons named in the patents had not resided there and were unknown to the witnesses, but did not call the register and receiver, or the solicitor through whom some of the patents were obtained from the Land Office, or the officers who had witnessed and taken acknowledgment of deeds purporting to convey the interest of the patentees to the defendant. *Held*, that the burden was on the Government to produce so much of this further evidence as could be obtained, and that in its absence the United States had not made all the proof of which the nature of the case was susceptible, and which was apparently within their reach.

In order to constitute the exemption of coal lands contemplated by the preemption act under the head of " known mines," there must be ascertained coal deposits upon the land, of such an extent and value as to make the land more valuable to be worked as a coal mine, under the conditions existing at the time, than for merely agricultural purposes.

The mere fact that there are surface indications of coal on public land will not of itself prevent the acquisition of title to the land under the preemption laws; nor will the fact alone that after acquisition of such a title the surface indications prove to be veins which are, by a change of circumstances, profitably worked, invalidate such a title.

IN equity. The bill was filed in the name of the United States by the attorney general on January 22, 1880, the object and prayer of which were to declare void and cancel sixty-one patents for as many distinct pieces of land, situated at different places in Las Animas County, in the State of Colorado, amounting in the aggregate to $9565\frac{95}{100}$ acres. To the original bill the Southern Colorado Coal and Town Company, a corporation organized under the laws of Colorado, was the sole defendant. The patents in question were issued at different times between October, 1873, and October, 1874, upon preemption claims, under the act of 1841. In each case there appeared to be filed all the necessary and proper affidavits, duly verified before the register or receiver of the land office at Pueblo, showing that the preëmptors had entered and settled in person upon the land on a day named, and had made improvements thereon, the nature of which was set out in detail, and that the lands in question were non-mineral lands,

and subject to preëmption under the acts of Congress relating thereto. Between May, 1873, and December, 1875, warranty deeds in the names of the preëmptors and patentees were made, acknowledged, and recorded, apparently conveying the premises to William S. Jackson, as trustee, who represented a number of individuals who had deposited money in his hands to be used in the purchase of lands in Colorado. On June 1, 1876, by deed duly acknowledged and recorded, but without covenant of warranty, Jackson conveyed and released all these lands to the defendant, the Southern Colorado Coal and Town Company. On January 20, 1880, that corporation was consolidated with other corporations under the name of the Colorado Coal and Iron Company, to which, upon that date, the lands in question were conveyed. Under date of February 1, 1880, the Coal and Iron Company made a mortgage covering the premises in question, with others, to Louis H. Meyer, as trustee, to secure an issue of bonds amounting to $3,500,000. On January 7, 1882, an amendment to the bill was filed, making the Colorado Coal and Iron Company, the consolidated corporation, together with Meyer, the trustee in the mortgage, parties defendant. The purchase price of the lands to the Government was $11,997.45, which was paid at the time to the proper officer, $1813.14 in cash, and the remainder in certificates known as agricultural college scrip, which by law was receivable for that purpose.

It was charged in the bill that these patents were procured by means of a fraudulent conspiracy entered into by and between Irving W. Stanton, register of the land office, Charles A. Cook, receiver for the land district, at Pueblo, in Colorado, Alexander C. Hunt, and others unknown, who, it was alleged, organized and had incorporated the Southern Colorado Coal and Town Company. In furtherance of this conspiracy, and as the means of accomplishing its purpose, it was alleged " that neither of the supposed preëmptors of the land as aforesaid described by their names, as stated in said several proofs of preëmption, or in the said certificates of location, ever settled upon the said lands or improved the same, as represented in said several proofs of preëmption, and that no person or per-

sons whatsoever, as represented in either of said certificates of location, appeared or presented himself before said Stanton or Cook, or either of them, at any time, and made proof of preëmption or agricultural college scrip location, either as preëmptor or as witness for any preëmptor as aforesaid described, as in and by said proofs of preëmption and location certificates, or either of them, as aforesaid, is supposed, but that the same, and each of them, are false and fraudulent, and were designed, made, and executed by said Stanton and Cook and said Hunt, and the said persons to your orator unknown, or some one or more of them, in the manner aforesaid, and for the purpose of fraudulently depriving your orator of its title to the said pieces of land."

It was further alleged that all the said supposed preëmptors were fictitious persons, and their names were fictitious names, and that the supposed names that appeared as witnesses to the said several proofs of preëmption were fictitious names, and that no such person or persons, either as preëmptors or as witnesses, had ever lived or been known in the county of Las Animas, where said pieces and parcels of land were located, and, in fact, that no such persons existed.

It was further alleged in the bill "that the aforesaid pieces and parcels of land are not agricultural land, and are not suitable for agricultural or grazing purposes, and are of no value for any purpose except for the coal deposits therein contained. . . . That the said several pieces and parcels of land contain large and valuable deposits of coal, and that the said deposits of coal were known to the said Stanton and Cook and said Hunt, and to the said person or persons to your orator unknown, who wrote out, signed, and executed, or caused to be written out, signed, and executed, the several proofs of preëmption and non-mineral affidavits at the time the said several proofs of preëmption and non-mineral affidavits were made out, signed, and executed."

It was also charged in the bill that the said Hunt was a stockholder in the Southern Colorado Coal and Town Company, and general manager of its business, and that the incorporators of said company and the trustees thereof, including

William S. Jackson, "knew at the time the aforesaid described land was conveyed to said company by said William S. Jackson, as hereinbefore described, that the several patents to said several pieces and parcels of land had been fraudulently obtained from your orator, and knew that the said several supposed preëmptors and patentees were myths and fictitious persons, and knew that the said Jackson had no right, title, or interest in said land, or any part thereof."

The answer of the Southern Colorado Coal and Town Company, filed November 2, 1881, specifically denied all the allegations of the bill alleging fraud, and denied that the said lands or any portion of them were mineral lands in the sense of not being lands capable of being acquired under the preëmption law, and set up by way of further defence that it was a purchaser of all the said lands in good faith for a valuable consideration without any knowledge or notice whatever of any or either of the pretended fraudulent acts and conspiracies in the bill alleged. Louis H. Meyer, on June 5, 1882, answered to the same effect, and by a stipulation the answer of the Southern Colorado Coal and Town Company was directed to stand as the answer of the Colorado Coal and Iron Company. Replications were duly filed, and the cause was heard on a large amount of proofs, resulting in a decree in favor of the complainant, declaring all the patents in the bill mentioned, and the subsequent conveyances of the land therein described to the defendants, to be fraudulent and void, and decreeing that they should be held for naught and be delivered up to be cancelled. The present appeal was from that decree.

It was held by the Circuit Court that the charge in the bill, that the supposed preëmptors and patentees were fictitious persons, having no existence, was sufficiently proved; that, consequently, there being no grantees, no legal title passed from the United States; and that, as the defendants acquired no legal title by virtue of the supposed conveyances to them, they could not claim protection as *bona fide* purchasers for value without notice of the fraud. 18 Fed. Rep. 273.

*Mr. Benjamin H. Bristow* (with whom were *Mr. Lyman*

*K. Bass* and *Mr. David Willcox* on the brief), for appellants, cited: *Boone* v. *Chiles*, 10 Pet. 177; *Graffam* v. *Burgess*, 117 U. S. 180; *Insurance Co.* v. *Newton*, 22 Wall. 32; *Alexander* v. *Pendleton*, 8 Cranch, 462; *Cole* v. *Gourlay*, 79 N. Y. 527; *White* v. *McGarry*, 2 Flipp. 572; *Chapman* v. *Sims*, 53 Mississippi, 154; *Games* v. *Dunn*, 14 Pet. 322; *Miller* v. *Sherry*, 2 Wall. 237, 250; *Murray* v. *Ballou*, 1 Johns. Ch. 566; *Fletcher* v. *Peck*, 6 Cranch, 87, 133; *Dexter* v. *Harris*, 2 Mason, 531; *Wood* v. *Mason*, 1 Sumner, 506; *United States* v. *Minor*, 114 U. S. 233; *Deffeback* v. *Hawke*, 115 U. S. 392; *Western Pacific Railroad Co.* v. *United States*, 108 U. S. 510; *Westmoreland Coal Co.'s Appeal*, 85 Penn. St. 344; *Bell* v. *Wilson*, L. R. 1 Ch. 303; *Mullan* v. *United States*, 118 U. S. 271; *Reynolds* v. *Iron Silver Mining Co.*, 116 U. S. 687; *Sullivan* v. *Iron Silver Mining Co.*, 109 U. S. 550; *Morton* v. *Nebraska*, 21 Wall. 660; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Smelting Co.*, 106 U. S. 447; *Maxwell Land Grant Case*, 121 U. S. 379; *United States* v. *Throckmorton*, 98 U. S. 61; *United States* v. *Stone*, 2 Wall. 525; *Johnson* v. *Towsley*, 13 Wall. 72; *Moore* v. *Robbins*, 96 U. S. 530; *Marquez* v. *Frisbie*, 101 U. S. 473; *United States* v. *Atherton*, 102 U. S. 372; *Shepley* v. *Cowan*, 91 U. S. 330; *Atlantic Delaine Co.* v. *James*, 94 U. S. 207; *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 107 Mass. 290; *Meader* v. *Norton*, 11 Wall. 442; *Thomas* v. *Wyatt*, 31 Missouri, 188; *S. C.* 77 Am. Dec. 640; *Boyce* v. *Danz*, 29 Mich. 146; *Hatch* v. *Bayley*, 12 Cush. 27; *Calais Steamboat Co.* v. *Scudder*, 2 Black, 372; *Carpenter* v. *Longan*, 16 Wall. 271; *Knox County* v. *Aspinwall*, 21 How. 539; *Coloma* v. *Eaves*, 92 U. S. 484; *Marcy* v. *Oswego*, 92 U. S. 637; *Stearns* v. *Page*, 7 How. 819; *Wagner* v. *Baird*, 7 How. 234; *Burke* v. *Smith*, 16 Wall. 390; *Preston* v. *Preston*, 95 U. S. 200; *Badger* v. *Badger*, 2 Wall. 87; *Kirk* v. *Hamilton*, 102 U. S. 68; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *United States* v. *Smith*, 94 U. S. 214; *McKnight* v. *United States*, 98 U. S. 179; *State* v. *Milk*, 11 Fed. Rep. 389; *Commonwealth* v. *Pejepscot Proprietors*, 10 Mass. 154; *State* v. *Ober*, 34 La. Ann. 359; *United States* v. *Beebee*, 17 Fed. Rep. 36; *Harwood* v. *Railroad Co.*, 17 Wall. 78; *Willard* v. *Taylor*, 8 Wall. 557; *Polk* v. *Wendall*, 9 Cranch,

87; *Utterback* v. *Binns*, 1 McLean, 242; *United States* v. *McGraw*, 12 Fed. Rep. 449, 452; *United States* v. *Marshall Mining Co.*, 17 Fed. Rep. 108; *Miner* v. *Beekman*, 50 N. Y. 337, 345; *Carr* v. *Wallace*, 7 Watts, 394; *Smith* v. *Drake*, 8 C. E. Green (23 N. J. Eq.), 302; *Bomberger* v. *Turner*, 13 Ohio St. 263; *S. C.* 82 Am. Dec. 438; *McLoughlin* v. *Barnum*, 31 Maryland, 425; *Troost* v. *Davis*, 31 Ind. 34; *Bacon* v. *Cottrell*, 13 Minn. 194; *Green* v. *Dixon*, 9 Wis. 532; *Attorney General* v. *Balliol College*, 9 Mod. 407.

*Mr. Solicitor General* for appellee cited: *Zerbe* v. *Miller*, 16 Penn. St. 488, 495; *Stauffer* v. *Young*, 39 Penn. St. 455; *Garwood* v. *Dennis*, 4 Binney, 314; Stephens Ev. Art. 96; 1 Wharton Ev. § 356; *Moffat* v. *United States*, 112 U. S. 24; *Gaussen* v. *United States*, 97 U. S. 584, 590; *United States* v. *Minor*, 114 U. S. 233, 238; *Sampeyreac* v. *United States*, 7 Pet. 222; *Oliver* v. *Piatt*, 3 How. 333; *Diamond* v. *Lawrence County*, 37 Penn. St. 353; *S. C.* 78 Am. Dec. 429; *Morton* v. *Nebraska*, 21 Wall. 660, 674; *Polk* v. *Wendall*, 9 Cranch, 87; *Minter* v. *Crommelin*, 18 How. 87; *Mullan* v. *United States*, 118 U. S. 271, 277.

MR. JUSTICE MATTHEWS, after stating the case, delivered the opinion of the court.

It is fully established by the evidence that there were in fact no actual settlements and improvements on any of the lands as falsely set out in the affidavits in support of the preëmption claims and in the certificates issued thereon. This undoubtedly constituted a fraud upon the United States sufficient in equity as against the parties perpetrating it, or those claiming under them with notice of it, to justify the cancellation of the patents issued to them. But it is not such a fraud as prevents the passing of the legal title by the patents. It follows that to a bill in equity to cancel the patents upon these grounds alone the defence of a *bona fide* purchaser for value without notice is perfect.

In reference to such a case, it was said by this court, in *United States* v. *Minor*, 114 U. S. 233, 243: "Where the patent is the result of nothing but fraud and perjury, it is enough to

hold that it conveys the legal title, and it would be going quite
too far to say that it cannot be assailed by a proceeding in
equity and set aside as void, if the fraud is proved and there
are no innocent holders for value." *Meader* v. *Norton*, 11 Wall.
442, 458. It is, indeed, an elementary doctrine of equity that
where a grantor has been induced by fraud to part with the
legal title to his property, he cannot reclaim it from subse-
quent innocent purchasers for value. Hence it becomes neces-
sary, to support the decree of the Circuit Court, to maintain
as that court declared, that the legal title to the lands in ques-
tion did not pass from the United States by virtue of the
patents, because there were in fact no grantees. And it was
that proposition of fact which by the proofs introduced into
the cause the United States undertook to establish. The evi-
dence on that point is found in the depositions of fourteen per-
sons examined as witnesses. They were called to prove, and
did prove, in the first place, in respect to the several tracts of
land in controversy, the facts that they had not been settled
upon, and that no improvements had been made upon them by
any person. They also testified, in substance, that they were
acquainted at the time of the transactions with the lands, and
were acquainted with the people then living in Las Animas
County, some of them stating that they knew every white
man residing at that time therein ; that with the exception of
one person, named Martine, there were no persons in the
county at the time bearing the names specified as preëmption
claimants, and no persons bearing the names subscribed as
witnesses to their statements ; and that they never saw or
heard of persons residing in the county having such names.
This is the extent of this description of evidence, the weight
of which is to be estimated in connection with the fact that
the county of Las Animas, although sparsely settled, embraces
an area extending about 150 miles from east to west and about
40 miles from north to south. In corroboration of it testimony
was introduced, on behalf of the United States, of experts in
handwriting, with a view of establishing, by a comparison of
the documents, that they were fabricated, which, however,
was met by the opposing opinions of other experts called on

the part of the defendants. This evidence we think not only inconclusive, but entitled to no weight, not at all supporting the inference sought to be drawn that the same handwriting is traceable in the signatures of the various names. The conclusion, if warranted at all, must depend upon the statements of the other witnesses, the substance of whose testimony has already been given, and such presumptions of fact or law as legitimately arise thereon.

It is charged in the bill that these title papers were falsely and fraudulently made by the register and receiver combining with Hunt and others unknown in a conspiracy for that purpose, but there is no direct proof of such a conspiracy. It is sought to be inferred from the fact that the preëmption statements were falsely made, and from the evidence tending to show that the persons named were fictitious. There is no proof to connect the register and receiver with such a conspiracy, except the fact that the affidavits purport to have been made before them, and were certified to by them. Hunt's connection with it rests upon the fact that he procured deeds from the supposed patentees, conveying the lands to Jackson in pursuance of a bargain with him. It may well be admitted that if there were no actual persons who made applications as preëmption settlers, none who made and signed the necessary declarations and affidavits, and no persons as witnesses who attested the same, the register and receiver must have known the fact; but the fact of the conspiracy depends upon prior proof that the alleged transactions were mere fictions. The proof necessary to justify that conclusion is supposed to be found in the facts testified to by the witnesses, a summary of which has been given.

It certainly does not follow that no such persons in fact existed, as a necessary conclusion from the testimony of these witnesses that they knew no such persons as named in these papers. The utmost that can be said, as was said by the learned judge of the Circuit Court in delivering judgment in the case, is, that "if none of them were ever in the county, and no improvements were ever made upon the land, then the proofs upon which the patents issued were false, and the infer-

ence that the papers were manufactured without the presence of any persons bearing or assuming the names of the patentees is not more unreasonable than would be the inference that sixty-one actual persons committed perjury themselves, and suborned as many others to perjure themselves as witnesses, in order to acquire the title." This, it is argued, establishes at least that it is more probable that the grantees were fictitious than that they were real persons, and that, in view of the difficulty, if not the impossibility, of proving the negative proposition that no such persons existed, and of the fact that the defendants connect their title and right with a transaction which must have occurred with these grantees if they had an actual existence, the burden of proof is shifted from the United States to the defendants, and that, as the latter introduced no evidence tending to show the fact as they claimed it to be, the case of the complainants must be considered as established by a preponderance of proof.

We have had recent occasion to consider the question of the character and degree of proof necessary in such cases to invalidate titles held by purchasers in good faith for value, and without notice, under patents issued by the United States. In *The Maxwell Land Grant Case*, 121 U. S. 325, 379, 381, it is said : " The deliberate action of the tribunals to which the law commits the determination of all preliminary questions, and the control of the processes by which this evidence of title is issued to the grantee, demands that, to annul such an instrument and destroy the title claimed under it, the facts on which this action is asked for must be clearly established by evidence entirely satisfactory to the court, and that the case itself must be entirely within the class of causes for which such an instrument may be avoided. . . . We take the general doctrine to be, that when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the

ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal? In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

It thus appears that the title of the defendants rests upon the strongest presumptions of fact which, although they may be rebutted, nevertheless can be overthrown only by full proofs to the contrary, clear, convincing, and unambiguous. The burden of producing these proofs and establishing the conclusion to which they are directed rests upon the government. Neither is it relieved of this obligation by the negative nature of the proposition it is bound to establish. It is, indeed, sometimes said that a negative is incapable of proof, but this is not a maxim of the law. In the language of an eminent text writer: "When the negative ceases to be a simple one — when it is qualified by time, place, or circumstance — much of this objection is removed; and proof of a negative may very reasonably be required when the qualifying circumstances are the direct matter in issue, or the affirmative is either probable in itself, or supported by a presumption, or peculiar means of proof are

in the hands of the party asserting the negative." Best on the
Law of Evidence, Am. ed. Boston, 1883, § 270. So also *Ibid.*
§ 273: "When a presumption is in favor of the party who
asserts the negative it only affords an additional reason for
casting the burden of proof on his adversary; it is when a
presumption is in favor of the party who asserts the affirma-
tive that its effect becomes visible, as the opposite side is then
bound to prove his negative." Also *Ibid.* § 276: "This ap-
pears from the case of *Doe d. Bridger* v. *Whitehead,* 8 A. & E.
571, which was an ejectment by a landlord against a tenant
on an alleged forfeiture by breach of a covenant in his lease to
insure against fire in some office in or near London, in which
it was contended that it lay on the defendant to show that he
had insured, that being a fact within his peculiar knowledge.
The argument *ab inconvenienti* was strongly urged, viz., that
the plaintiff could not bring persons from every insurance office
in or near London to show that no such insurance had been
effected by the defendant, and *R.* v. *Turner* [5 M. & S. 206],
*The Apothecaries' Co.* v. *Bentley* [Ryan & Moody, 159], and
some other cases of that class, were cited. But Lord Denman,
C. J., in delivering judgment, said: 'I do not dispute the cases
on the game laws which have been cited; but there the
defendant is in the first instance shown to have done an
act which was unlawful unless he was qualified, and then the
proof of qualification is thrown upon the defendant. Here the
plaintiff relies on something done or permitted by the lessee,
and takes upon himself the burden of proving that fact. The
proof may be difficult where the matter is peculiarly within
the defendant's knowledge, but that does not vary the rule of
law.' And in the same case Littledale, J., said: 'In the cases
cited as to game, the defendant had to bring himself within
the protection of the statutes; and a like observation applies
to *The Apothecaries' Co.* v. *Bentley.* But here, where a land-
lord brings an action to defeat the estate granted to the lessee,
the onus of proof ought to lie on the plaintiff.' And this rul-
ing has been upheld by subsequent cases. *Toleman* v. *Port-
bury,* L. R. 5 Q. B. 288; *Wedgwood* v. *Hart,* 2 Jurist, N. S.
288; *Price* v. *Worwood,* 4 H. & N. 512."

Mr. Greenleaf states the rule in equivalent terms.   He says, 1 Greenleaf on Evidence, § 78: "To this general rule, that the burden of proof is on the party holding the affirmative, there are some *exceptions*, in which the proposition, though negative in its terms, must be proved by the party who states it.   One class of these exceptions will be found to include those cases in which the plaintiff *grounds his right of action upon a negative allegation*, and where, of course, this negative is an essential element in his case." And in § 80: "So, where the negative allegation involves a charge of *criminal neglect of duty*, whether official or otherwise; or fraud; or the wrongful violation of actual lawful possession of property; the party making the allegation must prove it; for in these cases the presumption of law, which is always in favor of innocence and quiet possession, is in favor of the party charged."

In the present case the facts shown are, in our opinion, not sufficient to overcome the presumption of innocence on the part of the register and receiver of the land office.   It is quite consistent with these facts that real persons, whether under their own or under assumed names, did actually appear before them and make preemption claims.   There is no testimony whatever tending to establish directly any complicity on their part with the fraud which may have been practised upon them and not through them.   It is certain that there were real persons acting in the matter.   The purchase price due on the entry of the lands was in fact paid.   There is no proof of any actual fabrication of the papers, the genuineness of which is not negatived by any internal evidence.   The allegations in the bill, that they were in fact manufactured by the register and receiver and Hunt, or by any one with their connivance, are entirely unsupported by direct evidence.

It is alleged in the bill also that "by the rules and regulations which then and since have governed it in the issue of patents for land located with agricultural college scrip, no patent was issued by your orator except on presentation at its General Land Office, by the person making such location, his agent, or his assign, of the duplicate certificate as aforesaid delivered to the locator for the land for which a patent is

claimed," and " that after the forwarding by the said Stanton and Cook of said supposed proofs of preëmption, said agricultural college scrip, said money, said non-mineral affidavit, and said duplicate certificate, in each of the said pretended preemption claims · as aforesaid mentioned, to your orator's General Land Office at Washington, the said Alexander C. Hunt, pretending to act as agent of each of said supposed preemptors, presented to the officers of the General Land Office such other duplicate certificate of location, and requested said officers to cause a patent for each of the said several pieces of land to issue from your orator to the said supposed persons in each case purporting to claim and apply for the same." And it is added that the officers of the General Land Office, confiding in the honesty of the register and receiver, and believing the statements contained in the proofs to be true, did issue its patents therefor. The allegation is that the patents were issued to Hunt. In point of fact, it appears from the evidence that a number of patents were delivered to Britton & Gray, W. P. Dunwoody, and W. W. Cowling, respectively, through whom the duplicate certificates were presented to the General Land Office for that purpose. There is no allegation that these were not real persons, nor are any charges made against them as participants in the fraud. They professed to represent the parties entitled to the patents; they must have known for whom in fact they were acting. There is nothing to show that they were not accessible as witnesses. From the correspondence in the record it appears that Britton & Gray were transacting business in the city of Washington, and that Cowling was also a resident of the District of Columbia. None of these parties were called by the government as witnesses. Whatever may be said as an excuse for the failure to call Hunt and Stanton and Cook, on the ground that they are charged with being the actual conspirators in the fraud, no reason can be assigned for not calling Britton & Gray, Dunwoody and Cowling.

Neither do we think the reason assigned, as an excuse on the part of the government for not calling the register and receiver as witnesses, is valid or satisfactory. One of them, it

was said at the bar, had died. But the other might and ought
to have been examined. He was one of its own officers,
through whom the government had received the price of the
lands sold, and which it has ever since retained. If his offi-
cial conduct was impugned, nevertheless his misconduct, if
proved, was not imputable to the defendants, and they should
not be prejudiced by the odium of an accusation against him.
The United States had trusted him, and, inspired by that
confidence, the defendants also had relied upon his official
acts. In this faith they had paid full value for what they had
reason to believe was a perfect title. They were not accused
of any complicity with, nor had they any knowledge of, the
fraud charged. In the absence of direct proof of his guilt
the government could not properly treat the defendants as his
confederates, nor deprive them of any defence which as a
witness he might be able to make for himself. The United
States had no higher interest at stake than to establish the
truth and justice of the transaction. It was due from it to
these parties, whose estate this suit was instituted to defeat, to
produce and examine as witnesses those who must have had
the best knowledge of the facts, so as not to force the defend-
ants to explanations which, by the very theory of their inno-
cence and ignorance, they were incapable of making. To raise
a suspicion, however strong, of the fraud and wrong-doing of its
own officers is not enough to justify the government in casting
upon the defendants the burden of establishing their title.

In addition, warranty deeds, made to Jackson as trustee,
were put in evidence by the government, reciting a considera-
tion in each case, amounting in the aggregate to $52,200, to
the payment of which Jackson also testifies. Each of these
deeds was executed, acknowledged, and recorded in conform-
ity with law. They were regular on their face, the acknowl-
edgments purporting to have been taken by public officers
before whom, it is recited, the grantors severally appeared
and acknowledged their execution. These officers, if called
and examined as witnesses, would probably have thrown some
light upon the transaction, and should have been examined
upon the points in issue. It is to be presumed that they could

have testified whether any persons in fact appeared before them at the times and places named in their certificates, and whether, if so, they were identified as being the persons named as grantors in the deeds. None of them were in fact called on the part of the United States, and no reason is assigned for not having done so. It thus appears that the government did not make all the proof of which the nature of the case was susceptible, and which was apparently within its reach.

On the other hand, the defendants, by their evidence, have fully established all-the steps by which they became connected with the transaction. The lands were bought and paid for at their full value by William S. Jackson, acting for himself and associates, who united together for the purpose of making purchases of land in that region, upon Jackson's belief and assurance of its ultimate value, expecting it to increase by the building of railroads and general growth of the country. He arranged with Hunt, who was engaged in dealing in lands, and had been Governor of the Territory, to pay for titles to such lands as he might accept. Hunt submitted to him descriptions of lands which he said he could control, from which Jackson made selections. For these Hunt sent to Jackson deeds duly executed, attested, and acknowledged, accompanied by receiver's certificates in regular form, showing that the party named as grantor was entitled to a patent. These he was advised by counsel to accept, and did accept in good faith, as being equivalent to patents. In many instances the patents were issued before the deeds were executed. Jackson had no connection whatever with making the proofs of preëmption, and had no knowledge in reference thereto, except such as was disclosed by the deeds and certificates, in reliance upon which, and without visiting the lands or having them examined, he bought. The deeds to Jackson were duly acknowledged before competent officers by persons certified to be the grantors therein named. The transactions were several, as regards the various tracts of land, and successive, during more than two years, the deeds being delivered within a period extending from May 2, 1873, to May 21, 1875. The circumstance that many of the acknowledgments of the deeds were taken

in Arapahoe County before a notary in Hunt's office, while the grantors purported to be residents of Las Animas County, was not calculated to raise any suspicion of fraud, as Jackson supposed that Hunt was dealing with the preëmptors, and was procuring their deeds to be executed for delivery to him, and it was natural to expect that this would be done at Hunt's own office. In fact, fourteen of the acknowledgments were taken before other officers, and some of them in Las Animas County. That Jackson and his assigns, the Coal and Town Company, and its successor, the Coal and Iron Company, in good faith believed that they had acquired a valid title to these lands, is manifest from their subsequent dealing with them. They not only paid full value for the lands in the condition in which they were, but they made large investments thereon in the way of improvements. At the time of the organization of the consolidated company there were upon the premises described in the bill coke-ovens and machinery in connection therewith, buildings constituting the town of El Moro, and coal-mine improvements, consisting of entries, rooms, gangways, tracks, chutes, repair-shops, houses, and store buildings. Coal was then, between six and seven years after Jackson's purchase, being mined upon one quarter section, and the town of El Moro covered thirty or forty acres, comprising twenty to twenty-five buildings, erected by various individuals, to whom the company had sold lots, in accordance with a regular survey and map of the town site. The entire value of the mine and coke improvements was estimated to be about $250,000. The property was used by the company in connection with works which they had established at South Pueblo for the manufacture of iron and steel, on which there had been an expenditure of from one to two millions of dollars, the coal and coke necessary for carrying on which was obtained from the coal mines on part of the premises in dispute. As against interests of this magnitude and value vested upon a claim of title, the good faith of which on the part of the defendants is absolutely unimpeached, the proof of a fraud which renders their title absolutely void should be stronger than the legal presumptions on which it may rightfully rest.

It is urged in argument by the Solicitor General that this case cannot be distinguished from that of *Moffat* v. *United States*, 112 U. S. 24. The two cases are undoubtedly similar in their general aspects, but, nevertheless, differ in some particulars most material to the decision. It is stated in the report of the case cited that "the testimony taken fully established the truth of the allegations and charges, except as to the knowledge by Moffat and Carr of the alleged frauds." The charges proven, or to be taken as proven, therefore, as set forth in the bill, were, that the title papers in the case were manufactured by a clerk in the office of the receiver, and that the receiver was also the owner of the agricultural college scrip used to pay for the lands located, and that, for the purpose of locating the land with it in the name of Quinlan, the register and receiver had inserted in a blank endorsement his fictitious name and residence, and in that name had located the scrip on the land, there being no such person, nor any settlement and improvement on the land; and that the duplicate certificate on which the patent issued was presented to the General Land Office by the defendant himself, who was thus brought into direct connection with the officers who had committed the fraud, and with the transaction before the issue of the patent. In that case Moffat did not offer his deed in evidence, was not examined as a witness, and attempted no proof either of his own innocence or of the payment of value, but stood without explanation as to who his immediate grantors were, or how he came in contact with them. The receiver was examined as a witness, but wholly failed to meet the charges alleged against him. There was further proof tending to show that the acknowledgments of the deeds to Moffat had been taken without identification of the grantors from whom Moffat received his deeds directly, and in respect to whom he must have had some knowledge. These circumstances, in our opinion, clearly distinguish that case from the present one.

There is, however, another ground on which it is contended by the government that the patents described in the bill are void. It is alleged that the lands in controversy were not subject to settlement and sale under the preëmption laws, being

"known mines" within the description of those laws. The act of September 4, 1841, 5 Stat. 455, c. 16, § 10, provided that no preëmption entry should be made on "lands on which are situated any known salines or mines." By the act of July 1, 1864, 13 Stat. 343, c. 205, § 1, it is enacted: "That where any tracts embracing coal beds or coal fields constituting portions of the public domain, and which as 'mines' are excluded from the preëmption act of 1841, and which under past legislation are not liable to ordinary private entry, it shall and may be lawful for the President to cause such tracts, in suitable legal subdivisions, to be offered at public sale to the highest bidder, after public notice of not less than three months, at a minimum price of twenty dollars per acre; and any lands not thus disposed of shall thereafter be liable to private entry at said minimum."

The language of the preëmption act of 1841 is preserved in § 2258 of the Revised Statutes. The act of 1864 and its supplemental act of March 3, 1865, 13 Stat. 529, c. 107, were substantially reënacted by the act of March 3, 1873, 17 Stat. 607, c. 279, now embodied in § 2347 of the Revised Statutes, and the sections immediately following. The force and meaning of the original legislation remain unchanged. The subsequent provisions relate to the classification and terms and mode of entry and sale of the coal lands excluded from preëmption by the laws on that subject. In reference to coal lands, which are noted on public surveys and plats as such, of course it is not to be disputed that their character is thereby made known so as to withdraw them from entry under the preëmption and homestead acts. Where this is not done it remains, as in the present case, to determine how the character of the lands is to be ascertained, so that they may be classified as those "on which are situated any known salines or mines."

It is argued by the Solicitor General, upon the facts as disclosed by the evidence in this record, that the lands covered by these patents embraced "known mines" of coal, and that, as such lands were expressly excepted out of the preëmption laws, the patents issued therefor were void for want of power on the part of the officer to issue them, as decided in *Polk* v.

*Wendall,* 9 Cranch, 87; *Minter* v. *Crommelin,* 18 How. 87; *Reichart* v. *Felps,* 6 Wall. 160; *Morton* v. *Nebraska,* 21 Wall. 660. In the last named case, *Morton* v. *Nebraska,* it was said (page 674): "The salines in this case were not hidden as mines often are, but were so encrusted with salt that they resembled 'snow-covered lakes,' and were consequently not subject to preëmption." In *McLaughlin* v. *United States,* 107 U. S. 526, the decree of the Circuit Court cancelling the patent, on the ground that it purported to convey lands as part of a railroad grant, which were excepted therefrom as mineral lands, was affirmed. The court say (page 528): "It is satisfactorily proven, as we think, that cinnabar, the mineral which carries quicksilver, was found there as early as 1863; that a man named Powell resided on the land and mined this cinnabar at that time, and in 1866 established some form of reduction works there; that these were on the ground when application for the patent was made by the defendant McLaughlin, as agent of the Western Pacific Railroad Company, and that these facts were known to him. He is not, therefore, an innocent purchaser." See *Western Pacific Railroad Co.* v. *United States,* 108 U. S. 510.

In the case of *Mullan* v. *United States,* 118 U. S. 271, after referring to the acts of Congress above recited, the court, speaking of the act of July 1, 1864, say (page 277): "This is clearly a legislative declaration that 'known' coal lands were mineral lands within the meaning of that term as used in statutes regulating the public lands, unless a contrary intention of Congress was clearly manifested. Whatever doubt there may be as to the effect of this declaration on past transactions, it is clear that after it was made coal lands were to be treated as mineral lands. That the land now in dispute was 'known' coal land at the time it was selected, no one can doubt. It had been worked as a mine for many years before, and it had upon its surface all the appliances necessary for reaching, taking out, and delivering the coal. That Barnard knew what it was when he asked for its location for his use is absolutely certain, because he was one of the agents of the coal company at the time, and undoubtedly acted in its behalf in all that he

did. If Mullan and Avery were ignorant of the fact when they acquired their respective interests in the property, it was because they wilfully shut their eyes to what was going on around them, and purposely kept themselves in ignorance of notorious facts. But the evidence satisfies us entirely that they were not ignorant."

It will thus be seen that, so far as the decisions of this court have heretofore gone, no lands have been held to be "known mines" unless, at the time the rights of the purchaser accrued, there was upon the ground an actual and opened mine which had been worked or was capable of being worked.

In the case of *Deffeback* v. *Hawke*, 115 U. S. 392, the legislation on the subject was reviewed at length. It was there held that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar, or copper can be obtained under the preëmption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such land, except in the States of Michigan, Wisconsin, Minnesota, Missouri, and Kansas. The court say (page 404): "We say 'land *known* at the time to be *valuable* for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral' in the sense of the statute is applicable. . . . We also say lands *known* at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land in which years afterwards rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler, and patented by the government, under the preëmption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We therefore use the term *known* to be valuable at the time of sale to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued."

It is not sufficient, in our opinion, to constitute "known mines" of coal, within the meaning of the statute, that there should merely be indications of coal beds or coal fields of greater or less extent and of greater or less value, as shown by outcroppings. The act of 1864 evidently contemplates a distinction between coal beds or coal fields excluded from the preëmption act of 1841 as "known mines," and other coal beds or coal fields not coming within that description. We hold, therefore, that to constitute the exemption contemplated by the preëmption act under the head of "known mines," there should be upon the land ascertained coal deposits of such an extent and value as to make the land more valuable to be worked as a coal mine, under the conditions existing at the time, than for merely agricultural purposes. The circumstance that there are surface indications of the existence of veins of coal does not constitute a mine. It does not even prove that the land will ever be under any conditions sufficiently valuable on account of its coal deposits to be worked as a mine. A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of the sale. The question must be determined according to the facts in existence at the time of the sale. If upon the premises at that time there were not actual "known mines" capable of being profitably worked for their product, so as to make the land more valuable for mining than for agriculture, a title to them acquired under the preëmption act cannot be successfully assailed. In the present case, the testimony, in our opinion, does not justify us in finding that at the time Jackson acquired his title there were upon any part of the premises in controversy any "known mines" of coal, in the sense of the statute.

For these reasons the decree of the Circuit Court is

*Reversed, and the cause remanded with a direction to dismiss the bill; and it is so ordered.*