ROBERT J. BRUYERE *vs.* SAMUEL A. CASTELLUCCI, *Administrator.*

ROBERT A. BRUYERE *vs.* CASTELLUCCI AND SONS, INC.

CASTELLUCCI & SONS, INC. *vs.* ROBERT J. BRUYERE.

MAY 6, 1964.

PRESENT: Condon, C. J., Roberts, Powers and Joslin, JJ.

POWERS, J. These are three actions of trespass on the case for negligence which arose out of a collision between two

motor vehicles at the intersection of Douglas Pike and Whipple road in the town of Smithfield. The cases were consolidated for trial to a jury before a superior court justice and resulted in verdicts of $12,000 for Robert J. (A.) Bruyere as the plaintiff in two cases and in a verdict for him as the defendant in the other. Samuel A. Castellucci, Administrator, and Castellucci and Sons, Inc., hereinafter called the defendants, have brought before us their bills of exceptions to numerous evidentiary rulings, to the denial of their requests to charge, and to the denial of their motions for new trials. The plaintiff Castellucci & Sons, Inc., has also brought a bill of exceptions which contains identical exceptions. By reason of the posture of these cases no reference will be made to Castellucci & Sons, Inc., as plaintiff, but our decision on the defendants' cases will be applicable to all cases.

It is established by the record that at or about 12:30 on the morning of October 2, 1960, Robert J. Bruyere was operating a 1957 Mercury station wagon southerly on Douglas Pike in said town. At the same time, Joseph Castellucci was operating a 1958 Chevrolet easterly along Whipple road in said town, headed for Douglas Pike where he resided.

The operator Bruyere, hereinafter referred to as plaintiff Bruyere, was alone in the station wagon, his destination being the city of Pawtucket. The operator Castellucci was accompanied by his wife and three sons. Mrs. Castellucci was seated in front with her husband and on her right was their eldest son, Richard. He was twenty-three and his two younger brothers, ages seven and nine, were passengers in the back seat of the Castellucci car.

The record further discloses that both cars arrived at or entered the intersection almost simultaneously, with tragic results. The plaintiff Bruyere sustained serious injuries, and the injuries to Mr. and Mrs. Castellucci were fatal. Mr. Castellucci died at approximately three o'clock the same

morning at the Roger Williams General Hospital to which he had been taken following the accident.

Although the testimony of plaintiff Bruyere and Castellucci's son Richard is in sharp conflict and the record is replete with oral and documentary evidence calculated to fix or rebut liability, such evidence, in the view we take of another aspect of the trials, need not be considered here. Doctor Edwin Vieira, a county medical examiner, was called as a witness by plaintiff Bruyere. He testified that in his official capacity he viewed the body of Joseph Castellucci at approximately 6 o'clock on the morning of the accident. He did not order an autopsy, but did call the state morgue at Howard, Rhode Island, talked with one of the attendants, known as "agents," ordered both bodies removed to the morgue, and also ordered that a specimen of blood be taken from the body of Joseph Castellucci, hereinafter referred to as the "decedent." The doctor did not know to which of the morgue attendants he talked.

Developing the evidence that began with the doctor's testimony, plaintiff Bruyere called Alfred V. Villatico, state senior toxicologist. He testified that some time before eight on the morning of October 3, 1960, he received a telephone call informing him that he was to pick up a blood specimen at the morgue. The witness was unable to identify his caller, but did remember that at about five minutes to eight that morning he was at the morgue and received a small bottle from John H. Bucci and Henry F. Cruise, the two attendants on duty at that time.

Notwithstanding defendants' continued objections to this line of inquiry, the toxicologist was permitted to testify that the bottle bore a label on which was written or printed, he could not remember which, the name "Castellucci." He further testified that he took the bottle containing the blood specimen to the laboratory at the state office building and there analyzed it for the express purpose of determining alcoholic content.

There then followed an examination of the witness as to his qualifications after which defendants objected to the toxicologist testifying as to the result of his analysis. This objection was based on the contention that there had been no showing that the blood so analyzed was in fact that of decedent.

The plaintiff Bruyere thereupon interrupted the testimony of the toxicologist and called the agents, Cruise and Bucci, who were on duty from 9 a.m. on October 2, 1960 to 9 a.m. the following day. Mr. Cruise remembered that the toxicologist picked up "some specimens" at the stated time, but did not know the name on the label and indicated that Mr. Villatico removed the specimens from the refrigerator where blood samples were customarily kept. It was also his testimony that he did not take any blood from the body of decedent, nor could be remember having seen anyone else do so.

It appears that the agents work in pairs on twenty-four-hour shifts. John Bucci, who was working with Cruise from 9 a.m. October 2 to 9 a.m. the following day, also testified. He stated that he did not take blood from decedent's body, did not see his fellow employee do so, but did remember releasing the body to an undertaker some time during the morning of October 2.

The plaintiff Bruyere then called Joseph F. Campbell and Martin F. Leyden, who were on duty during the twenty-four-hour period beginning at 9 a.m. on October 1. The latter employee was at that time somewhat new to the work and could recall nothing relative to the taking of decedent's blood or related circumstances.

The agent Campbell, however, testified that he received the call from Dr. Vieira about 6:30 October 2 and in response thereto transported the bodies of decedent and his wife from the hospital to the morgue. It is his testimony that he arrived at the morgue with the bodies about 7:45, put decedent's body in the refrigerator, but did not remem-

ber whether he took the blood specimen. He did remember that Leyden did not. It was the witness Campbell's belief, however, that the records kept at the morgue in October 1960 would show who had taken the specimen alleged to be that of decedent.

Thereupon the court took a recess and Campbell was sent to the morgue to pick up the records in question. When court reconvened, he testified that the records did not show who had taken the specimen. It appears that no such records were kept at that time but have been since.

The plaintiff Bruyere then recalled toxicologist Villatico to inquire into the results of his analysis. The defendants vigorously objected on several grounds, particularly on the ground that plaintiff Bruyere had completely failed to link the specimen analyzed with any that had been taken from the body of deceased. The agents had, over repeated objections, testified to the procedure attendant upon the taking and the preserving of blood specimens at the morgue and plaintiff Bruyere argued that he had laid a sufficient foundation, by reason of a presumption of regularity.

The defendants further argued that since decedent had lived until approximately three o'clock there was the further question of whether the blood analysis reflected stimulation possibly received by way of treatment at the hospital. Notwithstanding these objections, the trial justice permitted the toxicologist to testify as to the results of the test conducted by him. He described the method used and, again over objection, stated that he had found decedent's blood contained an alcoholic content of .144 per cent by weight per 100 grams.

Over defendants' repeated objections, toxicologist Villatico was permitted to describe the reaction of the human body to the oral intake of ethyl alcohol. He testified that he had participated at the University of Rhode Island in a number of experiments in which volunteer subjects were permitted to consume varying quantities of ethyl alcohol

at stated intervals during which they were given accepted tests for sobriety. Mr. Villatico's participation, he testified, consisted of taking blood from the subjects and relating the alcoholic content to their behavior patterns. He was permitted to supplement his personal observations by reference to the study of observation by others.

There then followed a long series of questions asked by plaintiff Bruyere, the object of which was to obtain an opinion as to the state of intoxication which would be represented by .144 per cent by weight of alcohol in the blood. To each question defendants objected and their objection was sustained or the answer stricken. Several times plaintiff Bruyere unsuccessfully attempted to obtain an answer to a hypothetical question bearing on decedent's sobriety or fitness to operate at the time of the accident. Each question included an assumption that decedent had consumed alcoholic beverages within an hour of the accident. Eventually he interrupted such efforts to call J. Richard Castellucci, apparently for the purpose of establishing the extent and time of decedent's drinking prior to the collision.

Decedent's son testified, however, that although he was with his father from 6:30 in the evening until a quarter to eleven and from midnight until the moment of the collision, decedent had consumed no alcoholic beverages during the time they were together. It was also his testimony that he had no knowledge of any drinks being served during the hour and a quarter that decedent was with Mr. Bernardo in the breezeway of the latter's home. Following this testimony, plaintiff Bruyere asked no further questions of the toxicologist, although questioning of the latter had been interrupted for the obvious purpose heretofore related.

The plaintiff Bruyere thereafter proceeded to put in evidence his own testimony as well as that of two police officers, several doctors and a representative of the Woonsocket Hospital. Several exhibits also became part of the record.

At the close of plaintiff Bruyere's cases defendants, with the trial justice's consent, reserved their right to move to strike all of the testimony theretofore adduced on the question of intoxication. The record discloses that they did so move after all parties had rested, but the record is so uncertain as to the trial justice's disposition of their motions as to require an interpretation by this court. It discloses that the trial justice evinced concern about the extent of the testimony which was subject to the motions and the cumbersomeness involved in the mechanical manner of striking large blocks of testimony. He proposed as a substitute for the literal striking that counsel refrain from referring to such testimony in argument and he would charge the jury to ignore it. Counsel for all parties agreed, but the trial justice added that he would preserve their rights by giving both sides an exception. The record then reads "(Plaintiff's and defendants' exceptions noted)."

In their bills of exceptions, defendants include an exception to the denial of their motions to strike all testimony relating to intoxication. Although plaintiff Bruyere argues before us that no such exception lies for the reason that the trial justice granted their motions to strike, we are constrained to conclude from the record that such is not the case.

In his charge to the jury the trial justice did instruct them to ignore the testimony in issue by stating: "Before I consider the evidence I want to make one observation. As you will recall, in this case there was evidence offered by the plaintiff Robert J. Bruyere concerning alcohol insofar as it affected Joseph Castellucci, deceased. I tell you now that that evidence is insufficient and that you should disregard it and give it no consideration insofar as your determination of the legal issues in these cases are concerned."

The jury returned verdicts of $12,000 against defendants Samuel A. Castellucci, Administrator, and Castellucci and

Sons, Inc., and also found in Bruyere's favor as defendant in the other case. Thereafter, the trial justice denied motions for new trials in the three cases.

Further, defendants took numerous exceptions throughout the testimony of toxicologist Villatico. They have included eleven such exceptions in their bills, pressing all of them in their oral argument and brief. In the view we take of their exceptions to the denial of their motions to strike as well as said eleven evidentiary rulings, it is not necessary to consider any other.

It is clear from the record that the trial justice, contrary to plaintiff's Bruyere's contentions, was of the opinion that nothing less than a showing of intoxication would be sufficient to justify the admission of evidence that decedent had been drinking on the evening in question. It was for the reason that the evidence objected to was insufficient that the trial justice instructed the jury to ignore it.

The plaintiff Bruyere, on the other hand, argued throughout that, on the issue of negligence as distinguished from credibility, all evidence of drinking was admissible and the sufficiency thereof went to the weight and not to its legal competency. Assuming without deciding that in a proper case such an argument might be validly made, the rule would not be applicable in the cases before us.

There is not a scintilla of evidence here that decedent had consumed any alcohol at all. No proper inference could be drawn from the testimony of decedent's son and there was a complete failure to identify the blood analyzed by the toxicologist as a specimen which had been taken from decedent's body. The plaintiff Bruyere was not entitled to an inference that, in all probability, the blood in the bottle labeled "Castellucci" was that of decedent solely because the county medical examiner had ordered the taking of such a specimen. Indeed, the bodies of both husband and wife were taken to the morgue and the name "Castellucci" is not otherwise identified.

Moreover, the defendants were entitled to cross-examine whoever might have been identified as the person obtaining the blood specimen on the issue of identity and every step of the procedure taken in connection with the manner in which the blood was obtained. See *State* v. *Weltha*, 228 Iowa 519.

The plaintiff Bruyere had the burden of establishing his cases by a fair preponderance of the credible evidence. He could not rely on a presumption which by a failure of evidence did not exist. There is a presumption of regularity that a public official will perform such duties as are assigned to him by law, absent a showing to the contrary, but such a presumption does not extend to circumstances as are here present. See *Greenough, Atty. Gen., ex rel. Carroll* v. *Board of Canvassers and Registration,* 33 R. I. 559, and *Signore* v. *Zoning Board of Review,* 98 R. I. 26, 199 A.2d 601.

The plaintiff Bruyere further contends, however, that notwithstanding the validity of the exceptions relied upon when taken, they cannot be considered by us for the reason that defendants made no motion to pass the cases, relying on *Horaho* v. *Wanelik*, 56 R. I. 193. There, at page 205 without reference to the basis for the exceptions, this court stated:

> "Defendants' thirteenth and fifteenth exceptions are without merit, as the trial justice granted their motion to strike out the testimony objected to, and, at their request, expressly charged the jury to disregard it and to erase it from their memory in the consideration of their verdict. The defendants cannot justly claim more than this unless the testimony objected to was so seriously prejudicial as to warrant a finding of a mistrial."

In the instant cases, however, we have concluded that the motions to strike were not granted and, if the *Horaho* case stands for the proposition that a motion to pass must be made and denied, the cases are readily distinguishable.

More than 40 per cent of plaintiff Bruyere's cases consisted of inadmissible evidence of the most prejudicial na-

ture given prior in time to any testimony relative to the collision and we are constrained to hold that the jury could not reasonably be expected to erase from their minds the impressions they received of decedent's condition. They may well have been so improperly influenced as to give to plaintiff Bruyere's account of the collision a conception completely different from that which would have otherwise been the case.

In *Marley* v. *Providence Journal Co.*, 86 R. I. 229, and citing cases in this jurisdiction, we held that where the evidence which was the subject of an exception may have had a controlling influence on the material aspect of the case, the error was one by which the losing party was prejudiced, and, if the court is convinced on the record before it that the objectionable evidence did have a natural tendency to affect the fairmindedness of the jury, only a new trial can cure it. The circumstances of the instant cases are such, in our judgment, as to require new trials in all cases.

Exceptions numbered 5 through 15 and exception numbered 31 of the defendants Samuel A. Castellucci, Administrator, and Castellucci and Sons, Inc., and of the plaintiff Castellucci & Sons, Inc., are sustained, and each case is remitted to the superior court for a new trial.

*Richard J. Israel, Francis V. Reynolds,* for Robert J. Bruyere.

*Gunning & LaFazia, Raymond A. LaFazia, Bruce M. Selya, Leonard F. Clingham, Jr.,* for Samuel A. Castellucci, Administrator, and Castellucci and Sons, Inc.