George PERRY, Plaintiff in Error,

v.

The CITY OF OKLAHOMA CITY, a Municipal Corporation, and Shell Construction Company, Inc., Defendants in Error.

No. 41937.

Supreme Court of Oklahoma.

April 7, 1970.

Rehearing Denied May 26, 1970.

Richard D. Hampton, Oklahoma City, for plaintiff in error.

Roy H. Semtner, Municipal Counselor, Walter M. Powell, Asst. Municipal Counselor, for defendant in error Oklahoma City.

Gus Rinehart and David J. Morrison, Oklahoma City, for defendant in error Shell Construction Co., Inc.

Oklahoma Trial Lawyers Ass'n, amicus curiae.

McINERNEY, Justice.

George Perry, as plaintiff, instituted an action against the City of Oklahoma City and the Shell Construction Company, Inc., to recover damages for personal injuries suffered by the plaintiff, a passenger in a car which collided with a concrete signal light abutment at approximately midnight in a street intersection. Griffith, the driver of the car, was fatally injured. The petition alleged negligence on the part of the defendants, singly and jointly, with respect to constructing, maintaining, and safeguarding the abutment and the condition of the intersection in order to protect the traveling public. This negligence, it was alleged, was the proximate cause of the collision and of plaintiff's injuries for which he seeks recovery.

The defendants alleged that the driver, Griffith, was negligent at the time of the accident in several specified particulars, all of which were observed by and known to the plaintiff, who took no action to prevent or to correct them or to take steps for his own safety; that the accident, and any injuries suffered by plaintiff, directly and proximately resulted from the negligent acts of the driver, and that the defendants, respectively, were not "guilty of any act of carelessness or negligence that caused or contributed" to the occurrence of the accident. Replies specifically denied the defensive allegation of the answers. Upon the issues thus joined, the matter proceeded to trial. The jury, acting under instructions not criticized upon appeal, returned a verdict for the defendants, upon which the trial court entered judgment. The plaintiff presented several assignments of error, but argued them under three propositions:

(1) Error in admitting evidence of the result of an analysis of blood purporting to be that of Griffith, the driver of the car in which plaintiff was a passenger;

(2) error in allowing improper cross-examination of plaintiff's witness by defendants over plaintiff's objection;

(3) error in excluding evidence of other and similar accidents at the place of this accident.

Plaintiff, in support of his allegation of error in admitting evidence of an analysis of blood taken from Griffith, the deceased driver of the car in which he was riding, argues that Title 63 O.S.1961, §§ 931–955, the Unexplained Deaths Act, precludes the admission of such evidence. The record wholly fails to show that the blood test was pursuant to the provisions of this Act. We said in In re Barger, Okl., 450 P.2d 503, 505 (1969) that if such evidence was inadmissible, it was incumbent upon the party objecting to the evidence of a blood test to support the inadmissibility of the evidence by a proper showing. Plaintiff in this case completely failed to fulfill this duty.

The specific provision on which plaintiff relies provides that "No report, findings, testimony or other information of the State or County Medical Examiner or their assistants shall ever be admitted in evidence in any civil action * * *." § 949. These reports, finding, etc., necessarily must be the result of official action taken under the direction of either the State Medical Examiner, a County Medical Examiner, or one of their appointed assistants. These are the only persons authorized by the Act to launch an investigation of an unexplained death, §§ 941 and 943. The record contains not a scintilla of evidence that a medical examiner or his assistant ever commenced an investigation in connection with the death of Griffith.

 The record does show that Griffith was killed in the accident in which plaintiff was injured, but it fails to show who made the death certificate, although the Act requires, in case of an investigation under its authority, that only the "State Medical Examiner or his designated deputy, or the county examiner or his deputy, whoever shall have conducted the investigation" shall make the certificate of death, § 947. Furthermore, the record shows that Dr. H, who withdrew the blood

sample from the deceased driver, "was the orthopedic surgeon on call that day" at the hospital to which the driver was taken, but the record does not show that he was an examiner authorized by the Act to conduct an investigation. In the absence of evidence establishing this fact, it must be taken that Dr. H was acting simply in his capacity as "the orthopedic surgeon on call that day." Also, the record shows that the chemist, Sarchet, was directed to make the blood analysis by a regular duty police officer. Such an officer is not included in the list of those persons whom the Act authorizes to initiate or to conduct an investigation under the Unexplained Deaths Act, §§ 941 and 943.

The record further shows that Sarchet made the blood analysis in his capacity as chemist for the State Health Department. He testified that the laboratory wherein he works is jointly maintained by the State Health Department *and* the Board of Unexplained Deaths, not, as contended by plaintiff, that he is employed by the State Health Department in the Board of Unexplained Deaths Laboratory and Information Center. Such *joint maintenance*, or "collaboration", is authorized expressly, but not commanded, by § 936 of the Act. This provision is intended to promote economy in the administration of an activity which, in less populous states, may not demand the full-time service of a laboratory; it is not intended to merge two separate governmental agencies. See Official Comment to its source, Section 7 of Model Post Mortem Examinations Act, in 1954 Handbook, National Conference of Commissioners on Uniform State Laws, p. 200. It follows that the employees therein are the employees of both organizations. Sarchet expressly testified that he occupies such a position of dual employment. The work in the laboratory may be either that of the Health Department or that of the Board of Unexplained Deaths. The legal characterization of Sarchet's acts depends upon whose work he does at the moment. Spartan Aircraft Co. v. Jamison, 181 Okl. 645, 75 P.2d 1096 (1938).

The record here shows that Officer McKittrick, acting as representative of the Oklahoma City Police Department, sought the services of the State Health Department, not those of the Board of Unexplained Deaths. Sarchet's gratuitous assumptions could not change this fact. Also, as shown above, Sarchet has no authority under the Act to institute an inquiry. Only a medical examiner could do this. Since the record contains no evidence whatsoever of any action by a medical examiner or a deputy medical examiner, it must be taken that Sarchet was acting simply as a chemist in the State Health Department Laboratory in response to a police officer's request for an analysis, not as a chemist under the Board of Unexplained Deaths in aid of an investigation not shown ever to have been launched.

The record in this case contains no evidence that the State or County Medical Examiners or their assistants or deputies were the procuring source of the blood test. And we find nothing in the statutes, and no statute has been cited to us, that precludes a laboratory technician of the State Health Department, such as Sarchet, from being a witness in a civil action in any court of this state and testifying as to findings made pursuant to his employment by that Department. Under the circumstances presented here, the result of the analysis of the blood of Griffith and of Sarchet's testimony concerning it were properly admitted.

■ We come now to the question involving the admission in evidence of the blood sample taken from the body of the deceased driver, Griffith. There was evidence by Officer McKittrick that he discovered a strong odor of " * * * some alcoholic beverage" in the wrecked vehicle and that interrogation of the surviving occupants of the death car at the hospital indicated that the three occupants had previously consumed some beer. Plaintiff had stated that "they all," including Griffith, the driver, had been drinking. Obviously, then, the blood test, which did show an alcoholic content of 0.22 by weight, bore sig-

nificantly upon the defendants' contentions that Griffith was sufficiently intoxicated to be incapable of driving properly, and did in fact drive improperly thereby causing the accident and plaintiff's injuries, and that plaintiff had knowledge of this improper driving and failed to take steps essential to prevent the accident. In view of testimony of Nichols, also a passenger, that nobody in the group had been drinking, it was significant on issues of credibility.

■ Our prior decisions establish the general propriety of admitting the results of tests of blood samples, Dunaway v. Southwest Radio & Equipment Co., Okl., 331 P.2d 365 (1958), even though taken from persons while unconscious or from dead bodies. J. H. Rose Trucking Company v. Bell, Okl., 426 P.2d 709 (1967); In re Barger, Okl., 450 P.2d 503 (1969); Bell v. J. H. Rose Trucking Company, Okl., 452 P.2d 141 (1969). Compare State ex rel. Evertson v. Cornett, Okl., 391 P.2d 277 (1964). No constitutional rights are infringed thereby. Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

The questions raised in this appeal challenge the sufficiency of the predicate for the admission of the sample, and a technical question as to admissibility under the pleadings. Plaintiff raises the question whether there was established sufficiently the identity and the integrity of the sample, enroute from the body of the deceased to the chemist who analyzed it and reported upon its conditions. A detailed recitation of the evidence is appropriate.

Officer McKittrick, in charge of the investigation of the accident, testified that he went to Baptist Hospital; that Griffith was in the north emergency room; that Dr. H was present; that Dr. H took a sample of Griffith's blood, which he put in a glass vial which the nurse took from a sterile place; that the nurse delivered the vial to McKittrick; that Officer Don Smith, who accompanied him, wrote on attached tape the deceased's name, the doc-

tor's name, and the date and time when it was taken; that Dr. H was requested to take the blood sample; that McKittrick retained, tightly covered, the bottle containing the blood sample, placed it in his coat and took it with him when he went to the police station to make the accident investigation report; that he then took it home with him, arriving about 3:30 or 4:00 in the morning, having had the bottle from about 1:30 or 2:00; that he placed the vial in the food compartment of the refrigerator; that about 8:30 A.M. he took the bottle from the refrigerator and brought it to the "Health Department"; that the period while the vial was in the refrigerator was the only time that it was out of his sight; that the vial was delivered by him to Mr. Sarchet, the chemist at the Health Department; that Officer Smith did not accompany him; that he took it to the Department for examination and asked the chemist to perform "a blood alcohol test on it," and then returned to duty. Mr. Sarchet, the chemist, testified that his records disclosed that on March 16, 1964, he received a vial containing a blood sample taken from Griffith; that his records disclose it was submitted by D. J. Smith whom he does not know, but "an officer for the police department, I know that," which from the context must mean that he knew he got it from an officer, but really did not know his identity, as he did not know McKittrick; that he ran the test, and that it showed 0.22 per cent by weight or alcohol.

■ This record accounts for the physical possession of the blood test, minutely, from the time it was drawn from Griffith's body, through its constant possession by McKittrick upon his person or in the refrigerator in his residence until he delivered it to Sarchet, and possession by Sarchet until he ran the test and made his report. There is no period shown by the evidence during which the sample was in unauthorized hands or in which it could have been tampered with. Plaintiff in no way attempted to show such a period. The nearest approach was to ask Officer Mc-

Kittrick if he had children at home, bringing the response, "I have two, yes, sir." No attempt was made to follow this up. This witness was not asked where the children were that morning, what were their ages or their habits, whether they were awake or asleep or anything else which would develop the likelihood that they might have disturbed this vial which remained in the refrigerator with tape and markings unaltered.

Plaintiff's authorities, Bruyere v. Castallacci, 98 R.I. 129, 200 A.2d 226 (1964); Apodaca v. Baca, 73 N.M. 104, 385 P.2d 963 (1963); People v. Sansalone, 208 Misc. 491, 146 N.Y.S.2d 359 (1955); Bauer v. Veith, 374 Mich. 1, 130 N.W.2d 897 (1964); Durkam v. Melly, 14 A.D.2d 389, 221 N.Y.S.2d 366 (1961); Benton v. Pellum, 232 S.C. 26, 100 S.E.2d 534 (1957) all involve cases where the evidence disclosed substantial gaps in the chain of identification or in control over the sample. They are therefore not persuasive here. The evidence here is similar to the facts in State v. Werling, 234 Iowa 1109, 13 N.W.2d 318 (1944) which has been referred to as "a red-letter case of perfect identification" (see 21 A.L.R.2d 1216, 1222, footnote 7). Dr. D testified that he had heard Officer McKittrick's testimony concerning the taking, the custody and the delivery of the blood sample, and that "there is nothing in the testimony that I have heard of the officer, as to the obtaining, keeping, transferring the sample, which would affect the outcome of the test." The plaintiff did not undertake to cross examine Dr. D nor to introduce testimony in rebuttal of his evidence. The attack on the identity and the integrity of the blood sample cannot be sustained.

■ As to the claim that the evidence of the alcoholic content of Griffith's blood was outside the issues made by the pleadings, we note that, while the driver's intoxication was not specifically alleged, his negligent and reckless driving was set forth, and that evidence of his intoxication would bear upon this issue. Moreover, the record significantly indicates that plaintiff and his counsel should have known, well in advance of trial, from inquiries made of plaintiff's witness, Nichols, when the latter's deposition was taken, that the question of drinking by the members of the party would be raised at the trial. We must reject plaintiff's claim of expansion of the issues beyond the pleadings and of surprise. Anderson v. Eaton, 180 Okl. 243, 68 P.2d 858 (1937).

■ Plaintiff has contended, also, that 63 O.S. 1961, §§ 931–955 is designed to pre-empt the field of medical examination, laboratory testing and expert testimony as to the physical condition of deceased persons, and to confine to criminal prosecutions all evidential inquiry as to such matters. We cannot sustain this contention, for several reasons.

In the first place, there is no express statement to that effect in the Act. Its title, limited in scope to "unexplained deaths", repels any such contention. It is elementary that the title is a proper guide to ascertaining legislative intent as an aid to statutory construction. Oklahoma Gas & Elec. Co. v. Oklahoma Tax Com., 177 Okl. 179, 58 P.2d 124 (1936). The National Conference of Commissioners on Uniform State Laws, which drew the model on which our legislation is founded, states in the prefatory note to the act that its purpose is "to provide a means whereby greater competence can be assured *in determining causes of death where criminal liability may be involved.*" 1954 Handbook, National Conference of Commissioners on Uniform State Laws, p. 196 (Emphasis supplied). The last sentence of 63 O.S. 1961, § 949, as a local addendum to the Commissioners' draft, cannot be construed as going beyond its express terms by enacting a repeal of the general law relating to proceedings in civil cases.

Plaintiff seeks to bolster its argument as to pre-emption by reference to an amendment of § 944 by S.L.1965, Ch. 258, § 2. As it originally existed, § 944 simply authorized the State Medical Examiner or

his designated deputy to require an autopsy when "necessary in connection with an investigation to determine the cause of death and the public interest requires it." The section required, as precedent to the autopsy, authorization by specified persons, or, in the absence of such authorization because of refusal or lack of time, on a proper showing, authorization secured through judicial proceedings. The 1965 Amendment added this sentence:

"The State Medical Examiner, his designated deputy or a County Medical Examiner, may collect such blood, fluid or body waste specimens as he deems necessary to carry out his duties as specified in this act. No autopsy permit shall be required as a prerequisite to the collection of such specimens."

Plaintiff's argument is that this provision, not merely permits the designated officials to procure the designated substances in investigations made under the Unexplained Deaths Act, but prohibits procurement by any other person, in any other manner or for any other purpose.

The first answer to this contention is that the legislation does not express such a prohibition. The existing law permitted such procurement in proper cases. Dunaway v. Southwest Radio & Equipment Co., Okl., 331 P.2d 365 (1958); State ex rel. Evertson v. Cornett, Okl., 391 P.2d 277 (1964). It is axiomatic that repeals by implication are disfavored. On its face, the amendment simply purports expressly to authorize the official medical examiners who conduct these post-mortem examinations to collect the described specimens and to free them from any implication that they must obtain the consent required for autopsies before making such collections. Moreover, that part of the title of the 1965 Amendment referring to § 944 states, "authorizing State Medical Examiner, designated Deputy or County Medical Examiner to collect certain blood, fluid or body waste specimens and providing that autopsy per-

mit shall not be required for such collection." Obviously, this language conveys no implication of the repealing or modifying settled law such as plaintiff envisages. The construction urged, for the reasons stated, cannot be sustained. Okla.Const. Art. V, § 57.

The proffered evidence of prior similar accidents which plaintiff sought to introduce and which the trial court rejected was limited to proposed evidence of a single witness, residing in the locality of the intersection, who, because he was not present at the time of this accident, could not give the details of the actual occurrences. He could only recite the subsequent conditions as he observed them. Under these limitations, the proposed evidence did not meet the requirement that evidence of prior accidents, as indicative of the dangerous condition of the locus and of the defendants' knowledge thereof, must show that they happened at the same place, while it was in the same condition, under circumstances of a similar nature to those of the accident in litigation. St. Louis San Francisco Ry Co. v. Powell, Okl., 385 P.2d 465 (1963) and the cases therein cited and discussed. The circumstances here indicate that an intoxicated driver collided with the abutment around midnight. There was no error in the ruling of the trial court on this point.

Plaintiff's contention respecting erroneous cross-examination rests upon certain testimony that the defendants were allowed to elicit from Dr. H, whom plaintiff had called to testify concerning treatment administered to the plaintiff at the hospital after the accident. Dr. H was there on duty as the "orthopedic surgeon on call." Plaintiff carefully restricted his direct examination of Dr. H to the medical attention given plaintiff and the physical conditions thereby revealed. The specific cross-examination to which plaintiff takes exception consists of testimony that Dr. H also saw at the hospital the body of Grif-

fith, the driver of the car who was dead, as near as witness could recall, when the doctor first saw him; that he was sure he made a preliminary examination of the body, but has no records; that he did not recall determining the cause of Griffith's death, or whether he withdrew blood from the body, though possibly he did. Plaintiff's objection that the cross-examination was improper was overruled.

It is unnecessary to determine whether this cross-examination technically was improper. The independent testimony of McKittrick, the police officer who investigated the accident, established that Dr. H was present with Griffith's body in the North Emergency room; and that, at police request, he did take the sample of blood from that body in McKittrick's presence. This was all that defendants' cross-examination of Dr. H undertook to cover. Plaintiff had full opportunity to cross-examine Officer McKittrick, and did so. Plaintiff's contention that defendants would have been forced to put Dr. H on the stand as their own witness, subject to plaintiff's cross-examination and whatever limits defendants' production of him as witness might have imposed, clearly is not sound. Defendants made their record through Officer McKittrick, without regard to Dr. H's rather inconclusive testimony. At worst, that testimony was merely cumulative to the more specific evidence of Officer McKittrick. Any error in permitting this to be brought out on cross-examination, rather than on direct, was harmless, under the circumstances. Harrell v. London, 129 Okl. 240, 264 P. 172 (1928); Parish v. Ned, Okl., 264 P.2d 762 (1953).

Affirmed.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD and HODGES, JJ., concur.

JACKSON and LAVENDER, JJ., dissent.