The STATE of Oklahoma, ex rel.,
COMMISSIONERS OF the LAND
OFFICE, Appellant,

v.

Claude R. BUTLER, Appellee.

No. 51609.

Supreme Court of Oklahoma.

Dec. 8, 1987.

Dissenting Opinion May 24, 1988.

Rehearing Denied May 24, 1988.

Paul DeGraffenreid and R.R. Williamson, Jr., Oklahoma City, for appellant.

John S. Athens, Russell H. Harbaugh, Jr., Douglas L. Inhofe, Conners, Winters, Ballaine, Barry & McGowen, Tulsa, for appellee.

Lee R. West, J. Clayton, LaGrone, Richard A. Paschal, James E. Green, Jr., Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, P.C., for amicus curiae.

SIMMS, Justice.

The issue presented by this appeal is whether a reservation of an interest in "oil, gas and other mineral rights" includes coal. We hold it does not. Our holding is consistent with a long and unanimous line of cases. Our earlier opinion in this matter has previously been ordered withdrawn. Rehearing is granted, and this opinion is substituted therefor.

Claude Butler, the appellee, brought action to quiet title in the rights to the coal on land he owned in fee simple. His predecessors in interest acquired the property by three separate patents from the Commissioners of the Land Office by public sale of state-owned lands with notice as provided by law. One patent reserved to the state "an undivided fifty percentum of all oil, gas, and other mineral rights" and the other two patents contained reservations of "an undivided fifty percentum of all oil, gas and other minerals and mineral rights". The notice of sale stated that the land would be sold subject to the state's reservation of fifty percent of "all the oil, gas and other mineral rights". The Commissioners counterclaimed to quiet the state's claimed interest in the coal based on the reservations.

Mr. Butler sought summary judgment arguing that the phrase "oil, gas and other minerals" has an established meaning in Oklahoma; that it includes only oil and gas and other minerals produced as a component or constituent thereof. The Commissioners disagreed, urged the Court to hold that the phrase was ambiguous and to allow extrinsic evidence of the intent of the original parties at the time of the conveyances to be introduced.

The trial court found no significant distinction between the language of the patents, held that the reservations were unambiguous and disallowed any extrinsic evidence of intent. Based on our decision in *Panhandle Cooperative Royalty Co. v. Cunningham*, Okl., 495 P.2d 108 (1972), the trial court held that the state had reserved only fifty percent of the oil, gas and minerals produced as constituents and components thereof, whether hydrocarbon or non-hydrocarbon, and that no other miner-

al, including coal, was reserved by the state. The trial court granted summary judgment in favor of Mr. Butler and quieted title to all the coal in him.

The Commissioners bring this appeal contending primarily that the trial court erred by disallowing extrinsic evidence to show intent of the original parties. They argue that the phrase "oil, gas and other minerals" is ambiguous and that extrinsic evidence should therefore be allowed to show the intent of the original conveying parties. The same arguments have been presented and rejected repeatedly by this Court.

The phrase "oil, gas and other minerals" is, of course, common in the oil and gas industry. It, and its close variants, are standard terms which appear in very early oil and gas leases, and have commonly been used in fee conveyances and reservations, such as those before us today. The meaning of "oil, gas and other minerals" has been the subject of frequent and spirited litigation nationwide as well as in Oklahoma. Questions as to which unspecified minerals are included within the phrase have been answered with differing results under different rationales. See, for instance the annotation Grant, Lease, Exception, or Reservation of "Oil, Gas, and Other Minerals", or the Like, as Including Coal or Metallic Ores, 59 A.L.R.3rd 116 (1974).

We have a consistent line of cases which offer no possible result except that a reservation of "oil, gas and other minerals", standing alone, does not include coal. See, e.g., *Barker v. Campbell-Ratcliff Land Co.*, 64 Okl. 249, 167 P. 468 (1917)—reservation of "mineral rights" includes oil and gas; *Beck v. Harvey*, 196 Okl. 270, 164 P.2d 399 (1945)—reservation of "mineral royalty" does not include gravel; *State, ex rel., Com'rs of Land Office v. Hendrix*, 196 Okl. 596, 167 P.2d 43 (1946)—conveyance of an interest in and to all the oil, petroleum gas, coal, asphalt and all other minerals of every kind and character does not include gravel; *Cronkhite v. Falkenstein*, Okl., 352 P.2d 396 (1960)—mineral deed for "oil, gas and other minerals" does

not include gypsum rock; and *Holland v. Dolese Co.*, Okl., 540 P.2d 549 (1975)—reservation of an interest in "the mineral rights" did not include quarried limestone.

■ In Oklahoma we have relied primarily on the rule of ejusdem generis to determine the scope of such mineral conveyances. Ejusdem generis is simply a rule of interpretation. It gives guidance to the ordinary insight that when specific words are followed by general words those specific words restrict the meaning of the general. Thus, where the phrase "other minerals" follows the enumeration of particular classes of minerals such as oil and gas, the general words will be construed as applicable only to minerals of the same kind or class as those specifically named. *Wolf v. Blackwell Oil & Gas Co.*, 77 Okl. 81, 186 P. 484 (1920).

■ It is axiomatic that the interpretation of a written contract which is free from ambiguity is a judicial function and that oral testimony or other extrinsic evidence is not admissible to determine its meaning. The rules of interpretation of contract, both statutory as set forth in 15 O.S.1981, § 151, et seq., and non-statutory rules such ejusdem generis, are for use by the court to determine whether an ambiguity exists. An ambiguity in a written instrument allowing parol testimony does not appear until application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. Whether words of a contract or conveyance or other written instrument are ambiguous and therefore will support the need for extrinsic evidence is determined as a matter of law by the trial court. See, e.g., *Van Horn Drug Co. v. Noland*, Okl., 323 P.2d 366 (1958); *Panhandle Cooperative Royalty Co. v. Cunningham*, supra; *Morgan v. Wheeler*, Ks., 150 Kan. 667, 95 P.2d 320 (1939); *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, Tex., 596 S.W.2d 517 (1980). Appellants' suggestion that the rule of ejusdem

generis is a rule to solve an ambiguity and therefore extrinsic evidence should be allowed, is in error. This rule, like all rules of interpretation, exists to aid the trial court's determination of whether or not an ambiguity is present.

 There is no longer room for question in Oklahoma. The rule of law has evolved in this state that "oil, gas and other minerals" is not ambiguous. "Oil, gas and other minerals" is not a description of the entire mineral estate. The phrase has a certain and definite meaning: it includes only oil and gas and those minerals produced as constituents and components thereof.

In *Panhandle* supra, the Court upheld the trial court's determination that a mineral deed granting interest in "oil, gas and other minerals" was not ambiguous and that extrinsic evidence of the parties' intent as to the inclusion of metallic minerals such as gold, silver and copper was inadmissible. There the defendants had also argued that the phrase was ambiguous and included "all minerals", and that extrinsic evidence should be allowed to show the parties' intention to include metallic minerals. The Court there did not rely on ejusdem generis, although it recognized it as a rule of construction which is a useful part of our law, but the Court did cite and rely on *Cronkhite v. Falkenstein*, Okl., 352 P.2d 396 (1960), which was an ejusdem generis case.

In *Panhandle* the Court conducted a historical review of litigation on the issue which left no doubt that the phrase "other minerals" resulted from early litigation over rights to other distinct substances produced at the well head—particularly casinghead gas—under mineral deeds and conveyances of interest in "oil and/or gas" and "oil and gas". The phrase "other minerals" has a special purpose in extending the connotation of "oil and gas".

Applying the statutory rules of interpretation, 15 O.S.1961, § 151, et seq., the Court held that the deed in question granted interest in oil and gas and other minerals produced as oil or gas or produced as a component or constituent thereof whether hydrocarbon or non-hydrocarbon, but did not grant any other mineral or the right to produce any other mineral, including copper, silver, gold, or any other types of metallic ores or metallic minerals. *Panhandle*, supra at 113.

Following *Panhandle* the Court decided *Allen v. Farmers Union Cooperative Royalty Co.*, Okl., 538 P.2d 204 (1975), where metallic minerals were once again the subject of a quiet title action brought to determine whether they were included in a reservation of "all oil, gas and mineral rights". The same arguments which were presented and rejected in *Panhandle* and are now presented in the instant case, were before the Court in *Allen*, and were summarily rejected.

The appellants there criticized the decision in *Panhandle*, and contended that the reservation is unambiguous and clearly meant "all minerals" of every kind. Relying on the rule of ejusdem generis the Court determined that a reservation of "all oil, gas and mineral rights" has essentially the same meaning as "all oil, gas and other minerals" as set forth in *Panhandle* ... i.e., oil, gas and other minerals produced as a component or constituent thereof, whether hydrocarbon or non-hydrocarbon, and does not convey any other mineral or the right to produce any other mineral including copper, silver, gold or any other types of metallic ores or metallic minerals. The Court reaffirmed its holding in *Panhandle* that a deed granting oil, gas and other minerals is not ambiguous and consequently no extrinsic evidence of an interpretative nature could be introduced to ascertain the intention of the parties.

While coal was not the mineral directly at issue in *Allen*, the question of coal ownership was passed on indirectly by the Court in considering the mineral conveyance from Farmers to Flag. Farmers owned an interest in "oil, gas and other minerals" and conveyed to Flag an interest

in the "oil, gas, coal, iron, and other minerals". Farmers, held the Court, could not convey to Flag an interest in metallic ores or minerals as Farmers owned only an interest in the "oil, gas and other minerals" and consequently could only convey to Flag an interest in such minerals as defined in the *Panhandle* case. at 209.

Certiorari was denied by this Court in *West v. Aetna Life Insurance Company*, Okl.Ct.App., 536 P.2d 393 (1975), wherein the Court of Appeals considered two groups of deeds in an action brought by plaintiffs to quiet title to metallic ores or minerals, including copper, gold, silver, and lead. The defendants were claiming under reservations contained in deeds of conveyance and also under grants in mineral deeds. At trial defendants offered to show by parol evidence the intention of the parties at the time of execution of the various grants and reservations. The trial court, however, refused to admit the evidence, holding the reservations and grants unambiguous in law and quieted plaintiff's title in and to the mineral ores and metals. Addressing the defendants' arguments that the phrase "oil, gas and other minerals" is ambiguous and should be subject to parol testimony, the Court of Appeals conducted a thorough review of the Oklahoma decisions, and stated that:

> "The courts of Oklahoma, both state and federal, over a course of more than half a century, [have adopted and applied] the rule of ejusdem generis ... A review of the rulings of the Oklahoma Supreme Court thereon constitutes a record of unanimity of ruling and decree, beginning with the case of *Kansas City Southern Railway Company v. Reinnam*, 63 Okl. 69, 162 P. 726 (1917), and continuing through the years to the recent case of *Panhandle Cooperative Royalty Co. v. Cunningham* ... The Supreme Court in construing contracts, statutes, deeds of conveyance, and other legal documents, have consistently adhered to the policy of 'stare decisis'." At 397.

Applying that rule in *West*, the Court of Appeals held that the deeds were not am-

biguous, and that the reservations did not include metallic ores or minerals and affirmed the trial court.

The certainty of the fixed meaning of "oil and gas and other minerals" in Oklahoma is also reflected by the Tenth Circuit decision of *Sloan v. Peabody Coal Co.*, 10th Cir., 547 F.2d 115 (1977). There, plaintiff had conveyed the land to third parties who leased to the defendant for coal mining purposes. Plaintiff had reserved one-half of "all the oil, gas and minerals in, on, or under the surface of said lands". In its determination of whether the reservation included coal, the trial court had refused to consider plaintiff's extrinsic evidence to show the intent of the parties and relied instead on the rule of ejusdem generis in support of its conclusion that the language was unambiguous as a matter of law. The parties had agreed that the issue was a legal one, that being whether under Oklahoma law the reservation included coal. Relying on Oklahoma decisions in *Allen*, *Panhandle*, and *West*, the Tenth Circuit affirmed the trial court's summary judgment for defendant and noted that the Oklahoma courts in their application of statutory and decisional law, have held that the reservation of "oil, gas and other minerals" in a deed is not ambiguous. Finding that the application of the rule of ejusdem generis is well established in Oklahoma, the Tenth Circuit found it was properly applied by the trial court and that the court was also correct in refusing to admit extrinsic evidence as to intent of the parties. The court also ruled that the chemical similarity between coal and oil does not lead to a different result or a different rule of construction.

We denied certiorari in *Hutchison v. McClure*, Okl.App., 621 P.2d 546 (1980), wherein the Court of Appeals held, in reliance on *Sloan* and 16 O.S.1971, § 19, that a reservation of "oil, gas and other minerals" did not reserve an interest in coal.

The rule of law is clearly well settled in Oklahoma. "Oil, gas and other minerals" or similar phrases are not, standing alone,

ambiguous and do not allow the introduction of parol evidence. The meaning of the words must be derived from common understanding which means that "other minerals" shall be limited to minerals similar in kind and class to "oil and gas". Coal is not similar in kind and class to oil and gas. Appellant urges us to find that since all three belong to the class hydrocarbons, they are similar and belong together. It is not, however, the chemical composition which is important, but rather those traits which a man of common understanding would find to be similar or dissimilar. While coal has some chemical similarities to oil and gas, dissimilarities dominate. Coal is a solid substance extracted from the land in ways fundamentally different from those used to obtain oil, gas or a "component or constituent thereof", *Panhandle*, 495 P.2d, at 113. We therefore reaffirm our consistent position that "oil, gas and other minerals" and similar phrases are not ambiguous. They do not include coal or other unspecified minerals.

Appellants also suggest that slight differences in the wording between the minutes of resolution of the Commissioners to sell the property, the notice of sale, and the patent support their argument that extrinsic evidence should be allowed as to intent of the original parties.

■■■ It is fundamental that a patent is solemn evidence of title; it is a written public grant of the highest character, and high evidence of its own validity. Where government officers have issued a patent in due form which on its face is sufficient to convey title to land described, it is to be treated as valid in actions of law. The recitals of the patent are conclusive as to the estate conveyed, and no evidence can be received for construction thereof. A patent is deemed to have been issued regularly and the presumption exists that all usual necessary steps were taken before the title was perfected by patent. See, e.g., *Sharp v. City of Guthrie*, 49 Okl. 213, 152 P. 403 (1915); *Bagnell v. Broderick*, 38 U.S. 436, 13 Pet. 436, 10 L.Ed. 235 (1839);

*Colorado Coal & Iron Co. v. United States*, 123 U.S. 307, 55 S.Ct. 131, 31 L.Ed. 182 (1887); See, 1 O.S.1981, § 11.

■■■ To look behind the patent to the minutes of the meeting would be totally unsupported by law. The notice, certificate of purchase, and patent were the specific acts of the Commissioners and the entire sale process was regular under 64 O.S. 1941, §§ 95, 96, and in fact, the words of the patent follow the statute, 64 O.S.1941, § 82(d).

■■■ Appellants' final argument is that a sacred trust of the school lands existed for the benefit of the beneficiaries and that as part of that trust, Commissioners were forbidden by the Constitution to diminish the corpus. They contend that by conveying coal rights without specific remuneration therefor, a diminution of the corpus was effected which was beyond the Commissioners authority. In support of this argument, appellants rely on *Lassen v. Arizona*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), which held that when trust lands are obtained by anyone, including the state, the trust must be compensated in money for the full appraised value. *Lassen* is inapplicable here for, inter alia, this land sold for more than its appraised value. Appellants' argument would mean that every time a new mineral was discovered on subject lands, appellants could argue in retrospect that at the time of sale it did not receive full compensation. We reject the argument and find the notion contrary to the language and spirit of the Enabling Act, the Oklahoma Constitution, and common sense.

The trial court correctly granted the motion for summary judgment and we affirm.

JUDGMENT AFFIRMED.

DOOLIN, C.J., and HODGES, KAUGER and SUMMERS, JJ., concur.

HARGRAVE, V.C.J., and LAVENDER, OPALA and WILSON, JJ., dissent.

OPALA, Justice, with whom HARGRAVE, Vice Chief Justice, and LAVENDER, Justice, join, dissenting.

Today's opinion affirms summary judgment for the plaintiff and quiets his title to *all the coal rights* in the property in litigation. The court holds that a reservation by the Oklahoma Commissioners of the Land Office [Commissioners] of a fifty-percent interest in all the "oil, gas and other mineral rights" underlying state lands retains in the grantor solely oil and gas, its constituents and components. The court specifically excludes from the ambit of the reservation both coal and other unspecified minerals. I recede from today's pronouncement because, in my view, the Commissioners were without statutory power to convey *more than* fifty percent of "all minerals" in the state-owned land. I would hence reverse the trial court's summary judgment and hold that the Commissioners' reservation effectively withheld from the patent's grantee a one-half undivided interest in the coal rights.

### FACTS

The appellee, Claude Butler [owner], sought to quiet his title to the coal rights in certain land he claimed to own in fee simple. His predecessors in interest acquired title to the property from the Commissioners by three separate patents.[1] The first patent contained a reservation to the state of "an undivided fifty percentum of all the oil, gas and other mineral rights." The reservation in the other two patents was of "an undivided fifty percentum of all oil, gas and other minerals and mineral rights." The property was sold to the owner's predecessors in interest through a public sale of state-owned lands. In the notice of sale it was stated that the land would be sold subject to a reservation in the state of an undivided fifty percent of "all the oil, gas and other mineral rights."

The owner sought summary judgment contending that the sole issue tendered was the construction of the phrase "oil, gas and other minerals" and that the meaning of this phrase stood fixed as a matter of law. The Commissioners urged extrinsic evidence should be allowed to show the intention of the parties. By summary judgment the trial court quieted title to all the coal rights in the owner. Finding no significant distinction in the language of the reservations in the three patents, the court held that the state reserved *only fifty percent of the oil, gas and minerals produced as constituents and components thereof,* whether hydrocarbon and nonhydrocarbon, *but failed* to retain any other minerals, including coal. According to the trial court, since the language in the patents and in the notice of sale was clear, explicit and unambiguous, the intention of the parties could be ascertained from the writings alone, without resorting to extrinsic evidence in a search for the parties' intent. The court took under consideration the pleadings, briefs of the parties and certified copies of pertinent documents on file in the court clerk's office. These instruments included the minutes of the Commissioners' meeting at which a resolution was adopted authorizing the sale of the lands in suit.

The Commissioners appeal from the adverse summary judgment. This court may review a lower court's ruling on a pure question of law and correct any misinterpretation or misapplication of the applicable legal norm. The error sought to be presented stands preserved for corrective relief.[2]

The property in suit, which had been acquired by the State through foreclosure

---

1. The first patent was dated November 29, 1943, the second August 20, 1957 and the third December 5, 1961.

 All statutory references to the cluster of enactments governing conveyancing by the Commissioners are to the 1941 compilation, the statutes that govern the interests in contest here.

2. See 12 O.S.1981 § 630 and *Southard v. Oil Equipment Corporation,* Okl., 296 P.2d 780, 782 [1956].

proceedings, became a part of the corpus of the permanent school fund.[3] That fund may be invested in first mortgages upon farmlands within the state.[4] The land came to be sold by the State in accordance with the authority conferred by a 1937 statute.[5]

I

## LEGISLATIVELY CONFERRED POWERS OF COMMISSIONERS

The validity of a Commissioners' sale of public land is governed by the power conferred by the legislature. The applicable statute, 64 O.S.1941 § 82, must be construed to define the scope of the established authority. The statutory provisions empowering the Commissioners to issue patents *become a part of the contract* involved in the conveyance of the land. The rights of the parties must hence be determined in light of the statutory provisions.[6] The Commissioners' power to sell state lands or any interest in them is exercised validly *only* when their acts comply with the statutory mandate. Persons deal-

ing with state functionaries are bound to know the extent of their authority [7] and are charged with *notice* of the Commission's statutory powers as well as with notice of the officials' nonconformity to the legally prescribed norms.[8]

The provisions of 64 O.S.1941 § 96 [9] set forth the terms of sale contracts and certificates of purchase for the sale of State land such as that involved in this case. This section provides in part, that *"the Commissioners of the Land Office shall, in all cases, reserve and retain forever title to fifty (50%) per centum of all the oil, gas and other mineral rights in and under lands so sold."* In *State v. Phillips Petroleum Co.* [10] we held that both this section and § 82(d) [11] must be followed, even though the two provisions may be viewed as somewhat contradictory. In order to give full effect to both of these sections, the § 96(c) requirement, which calls for a fifty-percent reservation of the mineral estate, is to be regarded as controlling.

The ascertainment of legislative intent is the cardinal rule of statutory construction.[12] That intent is determined from the whole act in light of its general purpose

---

**3.** See Art. 11 § 2, Okl. Const. Included in the permanent school fund are proceeds of the sale of public lands that have been or may be given by the United States government for the use and benefit of the common schools.

**4.** Art. 11 § 6, Okl.Const.

**5.** Okl.Sess.L.1937, Ch. 28, Art. 1 § 6 [later codified in 64 O.S.1941 § 82].

**6.** *Hoover Equipment Co. v. Board of Tax Roll Cor.*, Okl., 436 P.2d 645, 649 [1968] and *Baker v. Tulsa Building & Loan Ass'n.*, 179 Okl. 432, 66 P.2d 45, 50 [1936].

**7.** *State v. Frame*, 200 Okl. 650, 199 P.2d 215, 217 [1948].

**8.** *State v. Phillips Petroleum Co.*, infra note 10.

**9.** We do not quote here the text of 64 O.S.1941 § 96 because only its subject and not its verbiage is relevant to our discussion of the issues.

**10.** Okl., 258 P.2d 1193, 1198 [1953].

**11.** The terms of 64 O.S.1941 § 82(d) provide in pertinent part:

"The Commissioners of the Land Office shall reserve and retain forever the title to not less than forty (40%) per centum of all the oil, gas and other mineral rights in and under all lands to be sold; provided further, that the Commissioners of the Land Office are empowered to join in the execution of any oil, gas, or mineral lease on school lands, which have been sold and in which they have retained mineral interest, at their own discretion and without the necessity of advertising as required on State-owned lands. Such reservation is to be set out and included in all Certificates of Purchase and Patents issued to cover lands hereafter sold by the Commissioners of the Land Office...."

**12.** *Riffe Petroleum Co. v. Great Nat. Corp., Inc.*, Okl., 614 P.2d 576, 579 [1980]; *Lekan v. P & L Fire Protection Co.*, Okl., 609 P.2d 1289, 1292 [1980]; *Midwest City v. Harris*, Okl., 561 P.2d 1357, 1358 [1977]; *Stemmons, Inc. v. Universal C.I.T. Credit Corporation*, Okl., 301 P.2d 212, 216 [1956] and *Adams v. Fry*, 204 Okl. 407, 230 P.2d 915, 917 [1951].

and object.[13] All of the statutory provisions dealing with the same general subject should be construed together and their provisions harmonized.[14] A statute should also be construed to render every word, sentence and provision operative. It is presumed that every provision of a statute was intended to have some useful purpose and should be given effect.[15] The title to an act is a proper guide in ascertaining legislative intent.[16]

Section 82 is one in a cluster of statutes under Title 64 which deal with sales, leases and deficiency judgments relating to real property owned by the State and administered by the Commissioners.[17] These statutes must all be construed together in order to arrive at the legislative intent in any particular section. The Commissioners' authority *vis-a-vis* mineral rights in state lands is also dealt with in this chapter, although some of the statutes refer to these rights in different terms.

By the terms of § 92 the Commissioners are authorized to sell "oil, gas *or* other mineral leases" on state lands. This language suggests that the sale of mineral interests unrelated to oil and gas is covered by this statute. Reference is also made in § 82(d) to the execution of "oil, gas or mineral" leases by the State in the minerals reserved to it under this law. The title of the 1939 Act amending § 82 also provides in general terms that the amendments relate to the preservation of mineral rights. The titles to these acts and the references to mineral rights in general throughout this grouping of related stat-

utes emphatically demonstrate a legislative design to require the State's retention of *all* minerals in one half of the alienated lands.

A statute must also be construed so as to advance the beneficial purposes manifested by the legislature.[18] It seems clear that the statutorily required reservation was designed to preserve in the State a valuable interest in the minerals underlying state-owned lands. *This purpose is not met unless the reservation mandated by § 82 is construed to include all minerals in the retained subsurface estate.*

In sum, the quantum of interest conveyed by the patents here in contest must be measured by the extent of the Commissioners' legislatively conferred power to alienate land. The statutory provisions pursuant to which the Commissioners acted constitute an integral part of these patents. When the patents and applicable statutes are read together, it is crystal-clear that the phrase "oil, gas and other minerals" is indeed unambiguous. Its meaning *must* be divined not from extrinsic evidence but rather by reference to the restriction on the Commissioners' authority to transfer the State's interest in the land sold.

## II

### EJUSDEM GENERIS AND THE PHRASE "OIL, GAS AND OTHER MINERALS"

The owner contends *ejusdem generis* should be applied in rendering the meaning

---

**13.** *Midwest City v. Harris, supra* note 12 at 1358 and *Adams v. Fry, supra* note 12, 230 P.2d at 917.

**14.** *Melton v. Quality Homes,* Okl., 312 P.2d 476, 479 [1957] and *Becknell v. State Industrial Court,* Okl., 512 P.2d 1180, 1183 [1973].

**15.** *Matter of Ernest James C.,* Okl., 578 P.2d 352, 355 [1978] and *W. L. Street v. Bethany Firemen's Rel. and Pens. Fund,* Okl., 555 P.2d 1295, 1298 [1976].

**16.** *Phillips v. Oklahoma Tax Com'n.,* Okl., 577 P.2d 1278, 1282 [1978] and *Perry v. City of Oklahoma City,* Okl., 470 P.2d 974, 979 [1970].

**17.** For other statutory provisions, see 64 O.S. 1941 §§ 81–100.

In this group, 64 O.S.1981 § 91 commands that the Commissioners reserve "all oil, gas and minerals." The title of this section, enacted in 1963, provides that "all mineral rights [are] to be retained by the State." "Subsequent legislation may be considered as an aid in construing prior enactments upon the same subject." *Letteer v. Conservancy District No. 30,* Okl., 385 P.2d 796, 801 [1963].

**18.** *McGannon v. State,* 33 Okl. 145, 124 P. 1063, 1067 [1912].

of the phrase "oil, gas and other minerals." Under this well-known canon of construction, when a general phrase is followed by a list of specific items, the scope of the phrase is restricted by the nature of the specific items listed.[19] Applying this rule to the language of § 82(d), the owner argues, the use of words "oil and gas" before the general phrase "and other minerals" requires that the "other minerals" be limited only to those closely related to oil and gas, i.e., those which are constituents or components of oil and gas.

*Ejusdem generis* is *one* of many guides to statutory interpretation. *Other canons of construction are equally potent.* The *ejusdem generis* doctrine must yield to the rule that an act should be so construed as to carry out the object sought to be accomplished by it, so far as that object can be collected from the language of the statute. If the use of the *ejusdem generis* rule would *hinder or defeat* the plain legislative purpose or intent, it may not be applied in statutory construction.[20] It is apparent in the instant case that the application of *ejusdem generis* would defeat the clear intent of the § 82(d) command that the State retain a percentage of *all* mineral rights.

When construing the terms of § 82(d) together with § 96(c) our extant jurisprudence has implicitly recognized that the reservation contemplated by the legislature must encompass *all* minerals in the percentage interest required to be retained. Although the exact character of minerals included in the reservation was not specifically before this court in those cases, it is clear that we viewed the plain and ordinary meaning of the statutory language to embrace not only oil-and-gas, its constituents

and components, but *all other* minerals as well.[21]

In the present case, the Commissioners were required to reserve fifty percent of *all* minerals. They were hence *powerless* to pass to the owner *all* of the coal rights underlying the property in suit. Because the conveyance cannot be held to have alienated more than the quantum authorized by statute to be sold, the owner's predecessors in interest acquired only fifty percent of the coal. The remaining interest stood retained by the State's reservation.

## III

### PANHANDLE AND ITS EFFECT ON SUBSEQUENT CASE LAW

The phrase "oil, gas and other minerals" and similar phrases have been construed in a number of our decisions. Of primary significance is *Panhandle Cooperative Royalty Co. v. Cunningham.*[22] *Panhandle* dealt with the construction of three mineral deeds. The issue was whether *copper, silver, gold or other metallic ores or minerals* were included within the purview of the respective granting clauses in these deeds.

### A. *Farmers-Flag Deed*

There were essentially two deed forms to be construed in *Panhandle.* The first one, the so-called Farmers-Flag deed, contained in the granting clause a conveyance of "oil, gas and other minerals." Other provisions in that deed specifically referred to oil and gas and the right to execute oil-and-gas leases. The *four-corners' doctrine of construction*[23] was applied and all parts of the deed were carefully examined. It is

19. *Cronkhite v. Falkenstein,* Okl., 352 P.2d 396, 399 [1960].

20. *Couch v. State,* 71 Okl.Cr. 223, 110 P.2d 613, 616 [1941] and *Baccus v. Banks,* 199 Okl. 647, 192 P.2d 683, 687 [1947] *appeal dismissed* 333 U.S. 858, 68 S.Ct. 743, 92 L.Ed. 1138, *reh. den.* 333 U.S. 883, 68 S.Ct. 911, 92 L.Ed. 1158 [1948].

21. *State v. Duggins,* Okl., 258 P.2d 891, 894 [1953]; *Penner v. State,* Okl., 302 P.2d 144, 149–

150 [1956]; *State v. Phillips Petroleum Co., supra* note 10 at 1199 and *State v. Bright,* Okl., 261 P.2d 875, 877 [1953].

22. Okl., 495 P.2d 108, 113 [1972].

23. The four-corners' doctrine refers to the rule that confines construction of a written instrument to its four corners. See *Cleary Petroleum Corp. v. Harrison,* Okl., 621 P.2d 528, 532 [1980]. Extrinsic evidence to be used in search of the

through this analysis that the deed, taken as a whole, was determined *not* to be ambiguous. The clear intention of the parties —divined from the face of the conveyance—was to include in the phrase "oil, gas and other minerals" only those minerals that were produced as components and constituents of oil and gas. Although *Panhandle* recognized the *ejusdem generis* canon, we emphasized that it was not invoked in giving meaning to the Farmers-Flag deed. Rather, the intent of the parties to limit the effect of the granting clause to oil and gas and closely related minerals was ascertained from the clear language of the deed. *Panhandle's* language—that "in contracts dealing with the production and utilization of oil and gas, the expression 'and other minerals' has a special purpose in extending the connotation of 'oil and gas' only" [24]—must be regarded *as restricted to deeds*, such as the Farmers-Flag, which may be said to express the parties' "preoccupation with oil and gas". The holding does not, as a matter of law, govern the construction of *all* instruments or material in which the phrase "oil, gas and other minerals" is used. We surely did not intend to pronounce that the quoted language, *standing alone, must* always be restricted in its meaning to "oil, gas and other minerals produced as oil or gas or produced as a component or constituent thereof, whether hydrocarbon or nonhydrocarbon."

### B. *The Two Remaining Deeds*

My view of the *Panhandle's ratio decidendi* is reinforced by this court's construction of two other deeds under consideration there. The granting clauses in those deeds

also embraced "oil, gas and other minerals." Because other clauses in the conveyances did not reflect a clear intention to pass only an estate in the oil, gas and related components, those deeds, viewed as a whole, were deemed to be ambiguous. The case was remanded with directions to consider extrinsic evidence in a search for the parties' intent.

### C. *The Misperception of "Panhandle" and its Misapplication in Extant Caselaw*

The *Panhandle* message may have been misread. In *West v. Aetna Life Insurance Company* [25] a landowner sought to quiet title to his rights in metallic ores. The grantor-defendant had conveyed the property, but reserved the "oil, gas and other mineral rights." The defendant contended the reservation's language was ambiguous and extrinsic evidence should be allowed to show the intent of the parties. The court employed *ejusdem generis* to conclude that only minerals produced as components and constituents of oil and gas were reserved. The granting clause in *West* was similar to *Panhandle's* Farmers-Flag deed. Unlike in *Panhandle*, the court in *West* did not allude to other provisions in the deed or in the reservation. Its failure so to do makes it unclear whether the four-corners' doctrine was given effect in like manner as in *Panhandle* to demonstrate that the reservation was free from ambiguity. *West* may have improperly relied on *Panhandle* for the application of *ejusdem generis*. The latter decision neither teaches nor suggests that *ejusdem generis* should be followed to the exclusion of other canons of construction.

---

instrument's intended meaning is admissible *only* when the language used is susceptible of multiple meanings and there is a dispute between the parties as to the intended meaning of the language in controversy. See *Bryan v. Everett*, Okl., 365 P.2d 146, 148 [1961] and *Rose v. Cook*, 207 Okl. 582, 250 P.2d 848, 850 [1952]. Extrinsic evidence was unnecessary in this case because the phrase "oil, gas and other minerals"

*is not ambiguous when the statutes pertinent to their issuance are read in conjunction with the patents.*

**24.** *Panhandle Cooperative Royalty Co. v. Cunningham, supra* note 22 at 113.

**25.** Okl.App., 536 P.2d 393, 397–398 [1975].

The owner places even stronger reliance upon *Allen v. Farmers Union Co-Operative Royalty Co.* [26] *Allen,* which appears to rest on the same misperception of *Panhandle* as that found in *West,* does not cite *West.* The case similarly involved a deed that contained a reservation of "oil, gas and mineral rights". The trial court refused to consider the subsequent acts of the parties as extrinsic evidence of the intended meaning to be given the phrase. Instead, the rule of *ejusdem generis* was viewed as applicable. Its use resulted in the determination that the deed included only minerals produced as components and constituents of oil and gas. We affirmed the trial court's decision. There was no allusion in *Allen* to other provisions in the deed. This is so because *Panhandle* appears to have been accepted as clothing the phrase "all oil, gas and other minerals" with a fixed meaning. *Panhandle*'s construction of the phrase was not intended as a *per se* definition *for use in all cases.* Rather, the holding there doubtless was meant to be of limited application to instances where the meaning of the language is clear *from the construction of the instrument as a whole.*

*Allen* also refers to another case in which the *ejusdem generis* canon was applied—*Cronkhite v. Falkenstein.* [27] *Cronkhite* involved a dispute over whether the phrase "oil, gas and other minerals" included gypsum rock. There, *ejusdem generis* was applied to conclude that gypsum was not within the grant. Extrinsic evidence was also considered in a search for the parties' intent. The opinion emphasized that *ejusdem generis* is not to be applied when the result reached would be contrary to the parties' intent.[28] The use of *ejusdem generis,* together with the admission of extrinsic evidence, both led in *Cronkhite* to the conclusion that the parties did not intend to include gypsum in the reservation. *Allen*'s and *West*'s reliance

on *Cronkhite* to support the proposition that *ejusdem generis could be used in every case* to the exclusion of extrinsic evidence is clearly misplaced. *Cronkhite* stands for the principle that, when applicable, *ejusdem generis* may be used together with extrinsic evidence to arrive at the parties' intention.

### D. Early Case law Provides Guidance to Proper Application of Ejusdem Generis

A much earlier case, *Wolf v. Blackwell Oil & Gas Co.,* [29] demonstrates an approach similar to that used in *Cronkhite.* In *Wolf* a lease granted the right to produce all of the "oil, gas and other minerals." Elsewhere in the lease, the lessor reserved the rights to "1/10 of all the oil and other minerals" produced. Yet another clause gave the lessor the right to $100 per year for every well producing gas only. Although the *ejusdem generis* canon of construction was applied to determine what minerals were encompassed within the phrase "all oil, gas and other minerals," it is clear that the lease was considered in its entirety to then arrive at the conclusion that gas was excluded. Although *Wolf* may have left unclear the precise effect of *ejusdem generis,* that decision gives no ground for assuming that the rule may be used to the exclusion of the four-corners' doctrine.

*Ejusdem generis* was again invoked in *Vogel v. Cobb* [30] to ascertain if water was included in a grant of "oil, petroleum, gas, coal, asphalt, and all other minerals." The court considered extrinsic evidence as to the parties' intent.

None of the cases discussed thus far has dealt with the specific issue of whether coal is included within the phrase "oil, gas and other minerals." Most of them involve minerals very different in nature from oil

**26.** Okl., 538 P.2d 204, 208–209 [1975].

**27.** See *supra* note 19 at 399.

**28.** *Cronkhite v. Falkenstein, supra* note 19 at 399.

**29.** 77 Okl. 81, 186 P. 484, 485 [1920].

**30.** 193 Okl. 64, 141 P.2d 276, 280 [1943].

and gas, i.e. metallic minerals.[31] A recent federal case, *Sloan v. Peabody Coal Co.,* [32] addressed itself to the specific question whether coal is embraced in the quoted language. No doubt relying on a flawed analysis of *Panhandle,* the federal court was led to conclude that coal was excluded from a reservation of "oil, gas and other minerals." *Sloan,* a federal case, is of course not binding on us here.

While today's opinion appears to verbally clad *ejusdem generis* as a canon of construction, *the court applies the doctrine as though it were an inflexible and universal rule of law.* Its pronouncement gives the phrase "oil, gas and other minerals" a *fixed* meaning that excludes every mineral other than the constituents and components of oil and gas. The very ascription of a fixed meaning to the phrase makes it one of universal application and hence a rule of law rather than a canon of construction. The purpose of *ejusdem generis* is not to accord *fixed and unalterable* meaning to some particular verbiage, but rather to use it as an aid in construing language where specific things are named in a series that follow a general term. By its very nature, *ejusdem generis* must be employed only on a case-by-case basis. There is *no* authority for our acceptance of *ejusdem generis* as a universal rule of law. In fact, *Panhandle* specifically rejects the notion of the maxim's universality.

The court intimates today that the phrase "oil, gas and other minerals" is attributable to early litigation over rights to other distinct substances produced at the wellhead, particularly casinghead gas. Its account, which attempts to explain how the phrase has developed, is of doubtful historicity. I am persuaded that the verbiage might have been fashioned in the aftermath of *Barker v. Campbell–Ratcliff*

*Land Co.,* [33] where the court treated a reservation of "all mineral rights" as ambiguous and hence subject to further probing by parol evidence. It was after *Barker* that cautious conveyancers in the 1920s and 1930s began drafting "oil, gas and other minerals" to denote in deeds that oil and gas rights were either granted, excepted or reserved.[34]

## IV

## ACTS OF COMMISSIONERS CONTROL OVER NOTICE OF SALE

Another reason exists for concluding that the Commissioners did not have the power to alienate more than fifty percent of the coal rights. The provisions of § 82(a) require the Commissioners to adopt a resolution authorizing the sale of any land pursuant to this statute. The record in this case contains a certified copy of the minutes of the Commissioners' meeting held on September 11, 1938. A resolution adopted at that meeting approved the sale of the land involved in this suit. The resolution, which had been voted upon and approved by the Commissioners, stated that the State *shall retain fifty percent of the mineral rights in and under the lands sold.* When the notice of sale was published, it included language different from that found in the resolution. The phrase "all mineral rights" had been changed to "oil, gas and other mineral rights." The patents and certificates of sale used verbiage similar to that in the notice of sale. The Commissioners' official action and their intent with respect to this property's sale clearly was to retain fifty percent of *all* minerals.

The notice of sale and the patents issued cannot be allowed to control over the spe-

**31.** *Allen v. Farmers Union Co–Operative Royalty Co., supra* note 26 and *West v. Aetna Life Ins. Co., supra* note 25.

**32.** 10th Cir., 547 F.2d 115, 116 [1977].

**33.** 64 Okl. 249, 167 P. 468, 469 [1917].

**34.** See Bell, The Continuing Problem of 'Other Minerals:' Oklahoma Needs a Uniform Rule of Construction, 56 OBJ 2919 (footnote 4 at page 2928)[1985] and Emery, What Surface is Mineral and What Mineral is Surface, 12 Okla.L.Rev. 499, 512 [1959].

cific actions of the Commissioners. The Commission staff was without authority to act in contravention of the Commissioners' intent clearly expressed in their resolution. One who purchases an interest in school lands without making inquiry as to the Commissioners' compliance with the terms of their trust, is charged with notice of all defects and irregularities which exist in the sale proceedings and hence cannot claim the status of a bona fide purchaser.[35] The original purchasers of this land were deemed to have notice of the discrepancy between the official action by the Commissioners and the language of the reservation contained in the notice of sale and in the patents. They cannot be said to have acquired more than fifty percent of the rights in all minerals, including coal. Subsequent purchasers also are charged with notice of those defects or irregularities in sale proceedings which are apparent upon examination of the records. The law draws here a close analogy to the principles that apply in guardianship sales.[36]

The court today rejects out of hand the long-held view that the permissible search for the quantum of interest conveyed by the State may extend beyond the four corners of the State's conveyance to include the notices as well as the Commission minutes. Its refusal to allow an examination of critical and foundational instruments *dehors* the patents is entirely without support in legal precedent and appears to be contrary to *all* extant jurisprudence.[37]

Because I cannot countenance the court's mistaken reliance on *ejusdem generis* for its conclusion that the phrase "oil, gas and other minerals" has a universally fixed legal meaning whose definitional perimeter embraces only oil, gas and only those minerals that are produced as their constituents and components, I must stand in dissent from today's pronouncement.

**ALMA WILSON, Justice, dissenting:**

Appellee brought this action seeking to establish ownership rights to coal underlying land acquired from the Commissioners of the Land Office of the State of Oklahoma by Appellee's predecessors in interest.

By virtue of 64 O.S.1981 § 1, Appellant, the Commissioners of the Land Office of the State of Oklahoma, administers a federally created trust as set out in the Oklahoma Enabling Act. This trust originated from lands and monies which were engifted to the State at the time it was admitted to the Union in 1907. Investment of permanent trust funds includes first mortgages upon improved farm land within the State of Oklahoma. In the event that such mortgaged property is foreclosed, the title to the land is vested in the State and this land becomes a part of the corpus of the trust. The beneficiaries of this trust are the common schools of the State of Oklahoma.

As a condition of statehood the State of Oklahoma pledged its faith to preserve the lands and monies of this sacred trust for the beneficiaries to whom it is dedicated. Article XI, § 2 of the Oklahoma Constitution, provides as follows:

"... The principal shall be deemed a trust fund held by the State, and shall forever remain inviolate. *It may be increased, but shall never be diminished.* The State shall reimburse said permanent school fund for all losses thereof which may in any manner occur...." [*Emphasis added.*]

The Commissioners, as trustees of the school land trust, thus, do not stand in the same shoes as an ordinary landowner, but must carry out their constitutional duty to the trust in a way which will maximize revenue to uphold their obligations to the

---

35. *State v. Phillips Petroleum Co., supra* note 10 at 1199; *State v. Duggins, supra* note 21 at 894 and *State v. Bright, supra* note 21 at 877–878.

36. *State v. Phillips Petroleum Co., supra* note 10 at 1199; *Selement v. Gibson,* 171 Okl. 513, 43 P.2d 759, 760–761 [1935]; *Lowery v. Richards,* 120 Okl. 261, 248 P. 622, 624–625 [1926]; *In re*

*Standwaitie's Estate,* 73 Okl. 255, 175 P. 542, 543–544 [1918] and *Burton v. Compton,* 50 Okl. 365, 150 P. 1080, 1082 [1915].

37. See *State v. Phillips Petroleum Co., supra* note 10.

sacred trust. *Oklahoma Education Association, Inc. v. Honorable George Nigh,* 642 P.2d 230 (Okla.1982). Although the Commissioners are to be guided by the legislative enactments in the administration of the trust, these statutes cannot contravene the constitutional mandate to preserve the trust. Indeed, it must be presumed that the Legislature predicated these statutes upon the constitutional conditions imposed upon the trust and intended to maximize the preservation of valuable rights for the benefit of the common schools of this State. The express designation of the school lands and funds as a "sacred trust" has the effect of irrevocably incorporating into the Enabling Act, the Oklahoma Constitution, and conditions of the grant, all the rules of law and duties governing the administration of trusts. No act of the Legislature can validly alter, modify or diminish the State's duty as Trustee of the school land trust to administer it in a manner most beneficial to the trust estate and in a manner which obtains the maximum benefit in return from the use of trust property or loan of trust funds.

In the present case, the Commissioners' authority to sell state school lands or any interest in them must be viewed, first, within the mandate of the constitutional grant; and secondly, within the context of statutory procedures for the administration of the trust construed in a manner consistent with the constitutional trust mandate; and thirdly, within the terms of the sale contract and certificate of purchase. According to statutory procedures, the following offer appeared in the notice for the sale of the state owned property which is the subject of this appeal:

> "At such sale there shall be reserved and retained unto the state forever, title to fifty percentum of all the oil, gas and other mineral rights in and under all lands that may be sold. *The purchaser will receive an undivided fifty per centum of all the oil, gas, and other mineral rights in and under all tracts hereby offered....*"

Taking into consideration the constitutional trust mandate, consistent legislative enactments pertaining thereto, and the language in the granting clause under the doctrine of *ejusdem generis,* the only mineral rights received by Appellee upon acceptance of the offer amounted to 50% of oil, gas and the constituents thereof. Appellee was not offered and did not receive any interest in coal upon his purchase of the tracts in question. The majority's holding to the contrary results in a deprivation of valuable minerals owned by the school land trust estate and diminishes the corpus of the trust funds in violation of the Enabling Act, the Constitution and the laws of the State of Oklahoma.

I dissent.